UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 99-25
(CA-98-791-1)

_____

Willie Ervin Fisher,

Petitioner - Appellant,

versus

R. C. Lee, etc., et al,

Respondents - Appellees.

_____

O R D E R

_____

The court amends its opinion filed June 19, 2000, as follows:

On the cover sheet, section 6, line 1 -- the section is corrected to begin "Dismissed by published opinion. . . ."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WILLIE ERVIN FISHER,
<u>Petitioner-Appellant,</u>

v.

R. C. LEE, Warden, Central Prison;
NORTH CAROLINA ATTORNEY
GENERAL,
<u>Respondents-Appellees.</u>

No. 99-25

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CA-98-791-1)

Argued: April 5, 2000

Decided: June 19, 2000

Before WIDENER and TRAXLER, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Dismissed by published opinion. Judge Traxler wrote the opinion, in
which Judge Widener and Judge Goodwin joined.

_____

**COUNSEL**

**ARGUED:** Larry I. Moore, III, ADAMS, KLEEMEIER, HAGAN,
HANNAH & FOUTS, Greensboro, North Carolina, for Appellant.
Valerie Blanche Spalding, Special Deputy Attorney General, NORTH

CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Cynthia F. Adcock, ASSOCIATION OF AMERICAN LAW SCHOOLS, Washington, D.C., for Appellant. Michael F. Easley, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

_____

**OPINION**

TRAXLER, Circuit Judge:

Willie Ervin Fisher appeals the district court's dismissal of his petition for writ of habeas corpus, see 28 U.S.C.A. § 2254 (West 1994 & Supp. 2000), in which he challenges his conviction in North Carolina state court for the capital murder of Angela Johnson. Because Fisher has failed to make a substantial showing of the denial of a constitutional right, see 28 U.S.C.A. § 2253 (c)(2) (West Supp. 2000), we deny his application for a certificate of appealability and dismiss his petition for writ of habeas corpus.

I.

During the early morning hours of April 2, 1992, Willie Ervin Fisher broke into the home where his girlfriend, Angela Johnson, was living, broke her cheek and jaw, and stabbed her approximately thirty-two times. Although transported to the hospital for emergency treatment, Angela died from the wounds within a matter of hours. At the time of the attack, Angela was living in the home of her grandmother, Josephine Johnson, along with her mother, Shirley Johnson, her thirteen-year-old daughter, Shemika, and her four-year-old son by Fisher, Willie Ervin, Junior. The North Carolina Supreme Court summarized the events surrounding the murder as follows:

> On [April 1], [Fisher] came to the Johnson residence at about 9:00 p.m. Angela was not at home. He stayed for about three hours, holding Willie Jr. and watching television. Shirley Johnson worked at night and left to go to work at approximately 10:00 p.m. When Angela returned to the

2

house after her mother had gone to work, she and[Fisher] began arguing. Angela ran into her grandmother's room and said that [Fisher] had hit her in the eye.[Fisher] pushed Angela onto the bed on top of her grandmother and then hit her grandmother while trying to hit Angela. Angela's grandmother called the police.

Soon thereafter, a taxi which had been called earlier by either the victim or [Fisher] arrived at the residence. Angela ran out of the house, while trying to put on her shoes, wearing a T-shirt and jogging pants. [Fisher] tried to catch her but she got into the taxi and it "pulled off." Angela was crying and her hair was tousled. She had bruises all over her body and her shirt had been torn. Angela went to the Winston-Salem Journal/Sentinel where her mother was working.

Officer T.C. Smoot of the Winston-Salem Police Department received a call at 12:35 a.m. to go to the residence. When he arrived, he began talking to Josephine Johnson about an alleged assault. Angela and her mother arrived later. Officer Smoot noticed that Angela's shirt was torn and her eyes were swollen.

Angela and her mother went to the clerk's office where Angela obtained a warrant charging [Fisher] with assault. A criminal summons was issued for assault on a female and the police began searching for [Fisher]. Angela and her mother went home but did not go to bed until after 3:00 a.m. There were two twin beds in the bedroom. Angela and Willie Jr. were in one bed and Angela's mother and Shemika were in the other. Angela's grandmother was in a separate room. After they went to sleep, the telephone rang and Angela answered it. She gave the telephone to her mother who recognized the caller as [Fisher]. Angela's mother asked [Fisher] what had happened at the house. He told her that he had not hit Angela or her grandmother.

About ten minutes after the telephone conversation ended, Shirley Johnson heard someone kicking the front door. She

3

jumped up and saw [Fisher] stepping over broken glass from the door and coming into the house. He was wearing a Redskins jacket and had a knife in his hand. He came in the bedroom and told Angela to get up. Angela got up and started running towards, and then out the back door with [Fisher] following her. Angela ran to the front of the house and through the front door with [Fisher] still behind her. [Fisher] cornered Angela in the living room and began stabbing her in the chest and stomach. Shemika tried to pull him off Angela and she was stabbed on the arm and in the back. Angela's mother began fighting with [Fisher] and he struck her. [Fisher] dragged Angela out the front door, down the steps, and into the driveway--pulling off her nightgown. He continued to stab, beat, and kick Angela after he dragged her into the street. A next door neighbor, Lucius Simmons, heard the commotion and came to the door. He yelled to [Fisher] to stop. Simmons yelled again, [Fisher] stopped beating Angela and told Simmons to shut up. Simmons shot his gun into the air and [Fisher] ran down the street.

The police arrived at the residence and found Angela lying in Simmons' driveway covered with blood. She had a pulse and appeared to be alive. . . . [Shemika] had a three-inch cut on her arm and had been stabbed in the back. The wound in her back was about an inch wide and an inch long. It was gaping open and bleeding. Angela and Shemika were taken by paramedics to the emergency room. Shemika's wounds were cleaned and her lacerations repaired. Angela was unresponsive to emergency medical treatment and was pronounced dead at 7:30 a.m.

State v. Fisher, 445 S.E.2d 866, 869 (N.C. 1994).

After hiding out in nearby woods until the afternoon, Fisher called the Winston-Salem Police Department and told them where he could be found. He was arrested and taken to the hospital, where he was treated for wounds to his hand as well as other injuries. While at the hospital, Fisher made a voluntary statement to officers concerning the events and, four days later, was questioned by police officers at the police station after he waived his Miranda rights. See id. at 870.

4

Fisher did not dispute, in his statements or during the ensuing capital trial, that he broke into Angela's home and stabbed her to death. Rather, Fisher pursued a "voluntary intoxication" defense, asserting that by reason of his alcohol consumption and crack cocaine use prior to the murder, he was incapable of forming the specific intent necessary to be convicted of first-degree murder in the state of North Carolina. In support, Fisher testified concerning his alcohol consumption and crack cocaine use during the afternoon before and morning of the murder, and presented the testimony of Cliff Foster, a friend who was with Fisher and who could confirm Fisher's use of crack cocaine and alcohol during the four or five hours just prior to Fisher's return to Angela's home with the knife. By his testimony, Fisher claimed to have "blacked-out" between the time that Angela attempted to take the knife away from him and the time that Simmons fired his gun into the air. And, Dr. J. Gary Hoover, a clinical psychologist retained to assist the defense, testified that Fisher was likely functioning inside an alcohol and crack cocaine black-out and was unable to carry out a concerted, intellectually-based plan at the time of the murder.

The jury rejected Fisher's voluntary intoxication defense, however, and convicted Fisher of first-degree murder on the basis of malice, premeditation and deliberation and under the felony murder rule. Fisher was also convicted of first-degree burglary of Angela's grandmother's residence, and of assault with a deadly weapon inflicting serious injury for the stabbing of Angela's daughter.

A capital sentencing proceeding was then held. See N.C. Gen. Stat. § 15A-2000 (1999). The State offered no additional evidence during the sentencing phase of trial, relying instead upon evidence that had been previously presented. Fisher's counsel also relied upon evidence introduced during the guilt phase of trial, but presented the additional testimony of Lieutenant Murphy with the Forsyth County Sheriff's Department, who testified that Fisher had not caused any disciplinary problems during his incarceration, and the testimony of several other witnesses to confirm that Fisher's mother had suffered with an alcohol problem and that Fisher enjoyed a good relationship with his son. Additionally, Fisher's counsel introduced a certified criminal record check from the Forsyth County Clerk of Superior Court showing that Fisher had no prior convictions.

5

At the conclusion of the sentencing phase of the trial, the court submitted two aggravating circumstances for consideration by the jury: (1) that the offense was committed during the commission of a burglary, see N.C. Gen. Stat. § 15A-2000(e)(5); and (2) that the murder was "especially heinous, atrocious, or cruel," N.C. Gen. Stat. § 15A-2000(e)(9). The jury found both aggravating circumstances to be present.

With regard to statutory mitigating circumstances, members of the jury found that Fisher "ha[d] no significant history of prior criminal activity," N.C. Gen. Stat. § 15A-2000(f)(1), and that "[t]he capital felony was committed while [Fisher] was under the influence of mental or emotional disturbance," N.C. Gen. Stat. § 15A-2000(f)(2). Members of the jury also found the existence of six nonstatutory mitigating circumstances: (1) that Fisher voluntarily surrendered to law enforcement officers after first making contact with those officers concerning the offense; (2) that Fisher freely and voluntarily admitted to law enforcement officers his responsibility for Angela's death immediately after his arrest; (3) that Fisher's conduct while in custody at the Forsyth County Jail had been without any disciplinary problems; (4) that Fisher had voluntarily participated in Narcotics Anonymous while confined in the Forsyth County Jail; (5) that Fisher had expressed remorse for his actions; and (6) that Fisher had a passive, dependent personality by reason of an abusive father and an alcoholic mother. However, none of the jurors found that "[t]he capacity of [Fisher] to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired" at the time of the murder, an additional statutory mitigating circumstance submitted under N.C. Gen. Stat. § 15A-2000(f)(6), or that there were other unspecified mitigating circumstances, see N.C. Gen. Stat. § 15A-2000(f)(9).

Concluding that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, the jury ultimately recommended a sentence of death, which was imposed by the trial court along with prison terms of fifteen years for the burglary conviction and three years for the assault conviction. The North Carolina Supreme Court affirmed Fisher's conviction and death sentence, see Fisher, 445 S.E.2d at 880, and the United States Supreme Court

6

denied Fisher's petition for writ of certiorari. See Fisher v. North Carolina, 513 U.S. 1098 (1995).

Fisher then filed a motion for appropriate relief ("MAR"), see N.C. Gen. Stat. § 15A-1415 (1999), in the Forsyth County Superior Court. The state court imposed a procedural bar with respect to certain claims and, following an evidentiary hearing, denied the remaining claims. The Supreme Court of North Carolina denied certiorari.

Fisher thereafter filed a petition for writ of habeas corpus, pursuant to 28 U.S.C.A. § 2254, in the federal district court. The district court, adopting the recommendation of the magistrate judge, dismissed the petition and denied a certificate of appealability. Fisher timely filed a notice of appeal to this court. On appeal, Fisher raises two claims for habeas relief: (1) that he received, in various particulars, ineffective assistance of counsel during the guilt and sentencing phases of his state court trial; and (2) that the state trial court's instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague.

II.

A.

We begin with Fisher's claim that his trial counsel was constitutionally ineffective for failing to introduce additional evidence to support his voluntary intoxication defense and, at sentencing, to support two of the mitigating circumstances submitted to the jury -- that "[t]he capital felony was committed while [Fisher] was under the influence of mental or emotional disturbance," N.C. Gen. Stat. § 15A-2000(f)(2), and that his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired," N.C. Gen. Stat. § 15A-2000(f)(6). However, before turning to these substantive claims, we must address Fisher's assertion that these claims were not "adjudicated on the merits in [the] State court proceedings" and, therefore, that the standard of review set forth in 28 U.S.C.A. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, is not applicable.

When presented with an application for habeas relief, our first inquiry is to determine whether the claim raised on habeas was "adjudicated on the merits" by the state court. 28 U.S.C.A. § 2254(d); see Weeks v. Angelone, 176 F.3d 249, 257 (4th Cir. 1999), aff'd, 120 S. Ct. 727 (2000). If the claim was properly presented to the state court and the state court adjudicated it, the deferential standard of review set forth in § 2254(d) applies and federal habeas relief may not be granted unless the relevant state-court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.A. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings," 28 U.S.C.A. § 2254(d)(2); see Williams v. Taylor, 120 S. Ct. 1495, 1516 (2000). If, however, "a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits . . ., our review of questions of law and mixed questions of law and fact is de novo." Weeks, 176 F.3d at 258.

In this case, Fisher complains that the state court signed an order submitted by the State that contained factual errors, to the exclusion of his own submission. Consequently, the argument goes, the state court did not carefully consider the facts and applicable law or arrive at an independent, reasoned judicial determination. We find no merit to this contention.

First, Fisher's assumption that the state court did not carefully consider his MAR is belied by the record of that proceeding. Fisher filed his MAR in September 1995. In September 1996, the state court held a hearing to entertain various pending motions and, in November 1996, issued a written order which, among other things, permitted certain discovery by both sides, authorized Fisher's retention of and payment for an investigator and capital trial expert, and dismissed certain claims as a result of a state procedural bar. An amended MAR was filed and accepted and, beginning on December 17, 1996, the court held an evidentiary hearing on all remaining claims. During the evidentiary hearing, which lasted three days, numerous witnesses were presented and, at its conclusion, Fisher was again allowed to amend his MAR to assert an additional claim. Then, on January 3,

8

1997, the court gave both parties an opportunity to present a closing argument.

At the conclusion of these closing arguments, and following a recess, the state court announced from the bench the decision to deny Fisher's MAR. Although relating its reasoning in a somewhat abbreviated fashion, the court specifically concluded that Fisher had failed to demonstrate that his counsel's performance fell below an acceptable standard and failed to show that he was prejudiced by his counsel's performance. At that point, and then only at the explicit request of the State and Fisher, the state court agreed to entertain proposed findings of fact and conclusions of law from each side, which were to be submitted after the record had been transcribed. On May 8, 1997, the state court signed a 36-page order denying Fisher's original MAR, his first amended MAR, and the additional amendment which had been allowed at the conclusion of the evidentiary hearing. The order adopted was the order submitted by the State, no doubt because it actually memorialized the court's ruling at the conclusion of the evidentiary hearing. Indeed, Fisher's proposed order would have granted his MAR, in direct contravention to the state court's announced decision. Thus, we reject Fisher's contention that the state court did not render an independent, reasoned judgment on his claims of ineffective assistance of counsel simply because the court adopted the order submitted by the State.

Second, we are equally unpersuaded by Fisher's claim that the order contained erroneous factual findings. On habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he applicant [for habeas relief] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1). As the district court correctly concluded, Fisher has not shown that the state court findings are unreasonable, unsupported, or otherwise erroneous. Indeed, they are supported by competent evidence. Furthermore, the record is devoid of any indication that the state court treated the MAR in a haphazard or careless fashion and, on the contrary, it appears that Fisher was afforded much latitude in developing his claims and the evidentiary bases behind them.

Finally, to the extent the state court's order, whether from the bench or in writing, could be considered summary in nature, we have

9

consistently rejected such attempts to circumvent § 2254's require-
ment that we accord deference to the state court's application of
clearly established law to the facts found. See e.g., Weeks, 176 F.3d
at 259 (holding that the AEDPA standard of review applies even
where the state court has given no indication of how it reached its
decision); Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998)
(refusing to "presume that a summary order is indicative of a cursory
or haphazard review of a petitioner's claims").

We likewise reject Fisher's alternative contention that, based upon
the language of the adopted order, we must conclude that the state
court wholly overlooked his claims of ineffective assistance of coun-
sel during the sentencing phase of the trial. Fisher asserts that the
claims were presented to the state court in his MAR and addressed
during the evidentiary hearing, but contends that the state court must
not have "adjudicated" the claims because they were only minimally
referenced in the court's written order. Again, we will not assume that
the state court failed to "adjudicate" Fisher's properly presented
claims within the meaning of § 2254(d) simply because the state
court's ruling was summary in nature, see Wright, 151 F.3d at 156-57,
and we accordingly proceed to review Fisher's ineffective assistance
of counsel claims under the standards set forth in 28 U.S.C.A.
§ 2254(d)(1).[1]

B.

Having determined that the state court adjudicated Fisher's ineffec-
tive assistance of counsel claims on the merits, we turn to identify the
"clearly established Federal law, as determined by the Supreme
Court," which governs such claims. 28 U.S.C.A. § 2254(d)(1). The
Sixth Amendment requires that "[i]n all criminal prosecutions, the
accused shall enjoy the right . . . to have the Assistance of Counsel for
his defence," U.S. Const. amend. VI, and such assistance must be
effective, Strickland v. Washington, 466 U.S. 668 (1984). In order to

_____

[1] We also reject Fisher's contention that the § 2254(d)(1) standard of
review violates the due process clause and results in an unconstitutional
suspension of the writ, see art. I, § 9, cl. 2 -- a claim that he candidly
admits is barred by our existing precedent. See Green v. French, 143
F.3d 865, 875-76 (4th Cir. 1998), cert. denied, 119 S. Ct. 844 (1999).

10

establish an ineffective assistance of counsel claim before the state court, Fisher was required to establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," id. at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).

Similarly, in evaluating whether the defendant has shown actual prejudice from any such deficient performance, it is insufficient for the defendant "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693. Rather, a "reasonable probability" that the result would have been different requires "a probability sufficient to undermine confidence in the outcome." Id. at 694. When challenging a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. And, "[w]hen a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id.

Having identified the governing Supreme Court law, we are required to give deference to the state court's adjudications made pursuant to that law, as required by 28 U.S.C.A. § 2254(d). Specifically, in this case we review the state court's adjudication only to determine

11

whether it is "contrary to [this] clearly established Federal law," or whether it "involved an unreasonable application of . . . [this] clearly established Federal law." 28 U.S.C.A. § 2254(d). A state court decision is "contrary to . . . clearly established Federal law as determined by the Supreme Court," id., "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts," Williams, 120 S. Ct. at 1523. A state court decision "involve[s] an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), if the state court decision "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 120 S. Ct. at 1523. Of particular import, we must keep in mind that "an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 1522 (emphasis added). Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id.[2]

## III.

With these standards in mind, we now turn to the merits of Fisher's claim that his counsel was constitutionally ineffective for failing to present better and additional evidence in support of his voluntary intoxication defense and, at sentencing, his claims that he committed the crime while "under the influence of mental or emotional disturbance," N.C. Gen. Stat. § 15A-2000(f)(2), and that his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired," N.C. Gen. Stat. § 15A-

———————————————————————————

[2] During the pendency of this appeal, the Supreme Court decided the cases of Williams v. Taylor, 120 S. Ct. 1495 (2000), interpreting 28 U.S.C.A. § 2254(d), and Williams v. Taylor, 120 S. Ct. 1479 (2000), interpreting 28 U.S.C.A. § 2254(e)(2). Fisher then sought permission to file supplemental briefs addressing these authorities. Because we have considered these opinions and the arguments sought to be advanced in supplemental briefing, we see no need for additional briefing.

2000(f)(6). Specifically, Fisher complains that his counsel should have interviewed and presented several additional lay witnesses to testify that Fisher was drinking alcoholic beverages during the afternoon and early evening hours of April 1, 1992, should have presented more effective and additional expert testimony to support both the defense and the mitigating circumstances, and should have introduced a statement given by Angela to the police after Fisher's first attack upon her.

A.

We begin our review of Fisher's ineffectiveness claims with a review of the evidence that his counsel did present at trial. Because Fisher had confessed to killing Angela almost immediately after the crime, his only apparent defense was that of voluntary intoxication, i.e., that by reason of his alcohol consumption and crack cocaine use during the hours leading up to the murder, he was incapable of forming a specific intent to murder Angela. See State v. Cheek, 520 S.E.2d 545, 560-61 (N.C. 1999) (in order to obtain a voluntary intoxication charge, the defendant must show that his "`mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill.'" (quoting State v. Strickland, 361 S.E.2d 882, 888 (N.C. 1987)). In support of this defense, Fisher's counsel presented the testimony of Fisher, Cliff Foster, the person Fisher was with during the four or five hours immediately preceding the murder, and Fisher's court-appointed clinical psychologist, Dr. J. Gary Hoover.

First, Fisher testified that he used alcohol, marijuana, and crack cocaine on a regular basis. He testified that on April 1, 1992, he got off work at about 3:30 p.m., got home about 3:45 p.m., showered, talked to his father and watched television. At some point that afternoon, Fisher and his nephew went to a grocery store to cash Fisher's check and purchased beer and malt liquor while there. After returning home, Fisher testified that he drank at least four quarts of malt liquor and some additional amount of beer. Fisher testified that he later returned to a store with his sister's boyfriend to buy wine and more beer, and that he continued to drink until approximately 9:00 or 10:00 p.m., when his nephew dropped him off at Angela's house. During the next several hours, Fisher testified that he talked with his son, put

13

his son to bed, and fell asleep himself while waiting for Angela to come home. Fisher testified that Angela returned home between 11:00 p.m. and 12:00 a.m., and that an argument ensued which culminated in Angela striking him. According to Fisher, at approximately 12:30 a.m., Angela left the house in a taxi and Fisher walked to Cliff Foster's house.

Fisher testified that after arriving at Foster's home, the two began drinking alcoholic beverages and smoking crack cocaine, the latter of which was purchased during two separate trips to a nearby drug dealer. In between these purchases, Fisher telephoned Angela's residence and attempted to speak with her, but Angela's mother would not allow him to do so. Fisher testified that at approximately 4:00 a.m., he walked back to Angela's house, this time carrying a knife that he intended to use to "scare" her. Upon arriving, Fisher recalled breaking the glass in the door, entering the house and telling Angela that he wanted to talk to her. Fisher also recalled Angela coming towards him, he believed to try and take the knife away from him, and that a "scuffle" began. It is at this point that Fisher professes to have "blacked-out," testifying that he has no memory between the time that the "scuffle" started and the time that Angela's neighbor, Mr. Simmons, fired his gun into the air. Consequently, Fisher testified, he has no memory of stabbing Angela or Shemika with the knife, of dragging Angela across the lawn and tearing off her nightgown, or of stabbing Angela with the broken stick that Shemika had used to try and stop Fisher's attack upon her mother. Fisher testified that Simmons' gunshot "woke [him] up," prompting him to run from the scene and into the nearby woods where he hid from the police until later that afternoon. Although Fisher admitted telling the police officers, shortly after he was arrested, about various details of the actual attack upon Angela, he testified that these patchy, dreamlike memories of the intervening events only returned to him while he was hiding out after the murder.

Cliff Foster corroborated Fisher's testimony concerning his alcohol consumption and crack cocaine use in the hours immediately preceding the murder. Specifically, Foster confirmed that he and Fisher smoked four rocks of crack cocaine after 3:00 a.m. on the morning of the murder and that, after smoking the crack cocaine, Fisher made a telephone call and left.

14

Dr. Hoover, the court-appointed clinical psychologist who examined Fisher after the murder, also testified extensively for the defense. Dr. Hoover evaluated Fisher, collected social development information, and administered personality tests in order to develop a psychological profile, including the Minnesota Multiphasic Personality Inventory, the Millon Clinical Multiaxial Inventory, the Wechsler Adult Intelligence Scale, and the Schretland Index of Faking. Dr. Hoover diagnosed Fisher as suffering from chronic, persistent dysthymia, as well as with a substance abuse problem with overtones of chronic depression. He also had Fisher complete an intelligence test which revealed Fisher to be in the below-average range of intelligence. At trial, Dr. Hoover described his examination and evaluation of Fisher in detail, as well as Fisher's personality traits and profile and his alcohol and drug abuse history. Building upon this evaluation, Dr. Hoover thrice offered the opinion that Fisher was in an alcohol and drug-induced black-out state when he committed the murder, incapable of forming a plan to murder Angela or of carrying out such a plan. Among other things, Dr. Hoover opined that Fisher's "state coupled with his personality organization [and] his general intellectual level, rendered him to be very difficult to carry out any sort of concerted intellectually based plan," Fisher, 445 S.E.2d at 877 (internal quotation marks omitted), and that "at the time of the murder [Fisher] was functioning inside an alcohol/crack cocaine black-out and that his emotional or his behavior was directly related to reduced impulse control, reduced his ability to think, plan, organize himself inside what is probable to be an alcoholic black-out enhanced by the use of crack cocaine." Id. at 870-71 (internal quotation marks omitted). In short, Dr. Hoover evaluated Fisher and presented comprehensive testimony regarding Fisher's psychological profile, as well as his probable condition on the morning of the murder.

B.

We now turn to Fisher's contention that his trial counsel's presentation of evidence was nevertheless deficient because counsel should have also presented the testimony of several lay witnesses to corroborate Fisher's alcohol consumption during the afternoon and early evening hours of April 1, 1992 -- seven to twelve hours before the murder -- and better expert testimony regarding the likely effects of the alcohol consumption and crack cocaine use on his behavior. Had

15

counsel done so, Fisher asserts, there is a reasonable probability that the jury would not have entered a guilty verdict or recommended a sentence of death. See Strickland, 466 U.S. at 688, 694-95. We conclude that the state court was not unreasonable in its rejection of these claims. See Williams, 120 S. Ct. at 1523.

1.

We first address Fisher's claim that trial counsel was ineffective for failing to present the testimony of several lay witnesses who, at various times between the hours of 4:00 p.m. and 9:00 p.m., observed Fisher drinking alcoholic beverages. Having heard the testimony of these witnesses, the state court ruled that trial counsel's failure to present their testimony at trial did not amount to deficient performance, nor prejudice Fisher. We agree, and certainly cannot say that this was an unreasonable adjudication of the claim.

First, we agree that Fisher failed to demonstrate that his counsel was deficient in this regard. As noted by the state court, Fisher's trial counsel presented sufficient evidence to support a jury instruction on the voluntary intoxication defense at the conclusion of the guilt phase of his trial, and to support the submission of numerous statutory mitigating circumstances, including the (f)(2) and (f)(6) statutory mitigating circumstances, during the sentencing phase of the trial. Fisher testified concerning his alcohol consumption between the hours of 4:00 p.m. and 9:00 p.m., and Fisher and Foster testified concerning Fisher's alcohol consumption and crack cocaine use between the hours of 12:00 a.m. and 5:00 a.m., the four to five hours immediately preceding the murder. At most, the additional lay witnesses could have also testified that Fisher drank alcoholic beverages at various times between 4:00 p.m. and 9:00 p.m. -- a period of time some seven to twelve hours preceding the murder -- but their testimony as to the amounts that Fisher consumed would have been, as it was before the state court, vague and uncertain. Furthermore, none of the witnesses testified that Fisher was highly intoxicated, that he was stumbling or slurring his speech, or that they were concerned for his welfare or the welfare of others. Hence, the state court, after observing the testimony of these witnesses during the hearing on Fisher's MAR, made the quite reasonable finding that the witnesses "who saw [Fisher] on the afternoon and evening [before the murder] did not pay

16

attention to the amount [Fisher] drank, and therefore could not, with veracity, corroborate his alcoholic intake that day." J.A. 925.

We additionally note that after 9:00 p.m., when Fisher first arrived at Angela's house, Fisher testified that he watched television, played with his son, put his son to bed, and then slept himself until Angela returned home at approximately 11:00 p.m. or 12:00 a.m. There is no testimony, even by Fisher, that he consumed alcohol or drugs during the several hours between the time he arrived at Angela's home and the time he arrived at Foster's home. Thus, Fisher's counsel did fully explore the evidence of Fisher's alcohol consumption and crack cocaine use during the seven or eight hours immediately prior to the time of the murder, as testified to by Fisher and corroborated by Foster. Under the circumstances, therefore, we cannot say that the state court was unreasonable in its determination that Fisher's counsel was not constitutionally deficient because he failed to present lay witnesses to corroborate Fisher's testimony that he consumed alcoholic beverages before 9:00 p.m. on the evening prior to the murder. See Williams, 120 S. Ct. at 1523; see e.g., Williams v. Dixon, 961 F.2d 448, 451 (4th Cir. 1992) (failure to present more witnesses to support the intoxication defense was not ineffective assistance of counsel).

Second, even were we to conclude that Fisher's counsel should have presented the testimony of these witnesses, we are satisfied that there is no reasonable probability that the testimony would have changed the outcome of the trial. According to the evidence presented to the jury, Fisher had violently assaulted Angela when she returned home between 11:00 p.m. and 12:00 a.m. the evening before her murder. The assault ended only when Angela fled from the home and into a waiting taxi, with Fisher chasing her. Angela's shirt was torn in this attack, and she had multiple bruises. She then obtained a warrant charging Fisher with assault and the police began searching for him. By Fisher's own testimony, he was aware of and remembered the events occurring from 9:00 p.m. that evening up to and including the time, roughly 5:00 a.m. the following morning, when he returned to Angela's home, with knife in hand, minutes after confirming by a telephone call that Angela, too, had returned. Although Fisher testified about his alcohol consumption during the afternoon and early evening hours, he did not profess to be highly intoxicated at that time. And, even after consuming additional alcohol and adding crack

17

cocaine to the mix, he was able to clearly relate his acts of telephoning Angela from Foster's home without assistance, securing the knife at Foster's home in order to "scare" Angela, walking over two miles to Angela's home with the knife in hand, and forcibly breaking into the residence to continue his assault upon Angela. Finally, the evidence indicated that after Simmons fired his gun, and presumably frightened Fisher, Fisher stopped his attack upon Angela and ran without apparent difficulty from the scene.

Presented with such overwhelming evidence, the jury reasonably rejected Fisher's attempt to prove that he was incapable, as a result of his alcohol consumption and crack cocaine use, of forming a specific intent to kill Angela, see Cheek, 520 S.E.2d at 561, as well as his assertion at sentencing that his capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," N.C. Gen. Stat. § 15A-2000(f)(6). There is no reasonable probability that the rather insignificant testimony of those witnesses who had seen Fisher prior to 9:00 p.m. the evening before the murder would have changed the outcome of the jury's determination on either issue. Likewise, there is no reasonable probability that, had the jury found the (f)(6) mitigator, it also"would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. Accordingly, North Carolina's rejection of Fisher's claims was neither contrary to nor an unreasonable application of the governing Strickland test. Therefore, Fisher is not entitled to habeas relief under 28 U.S.C.A. § 2254(d) on this basis.

2.

We likewise reject Fisher's claim that his trial counsel was ineffective in his presentation of expert testimony to support the voluntary intoxication defense, as well as the (f)(2) and (f)(6) mitigating circumstances. With regard to the voluntary intoxication defense, Fisher complains that his court-appointed clinical psychologist, Dr. Hoover, began his evaluation too late and was insufficiently prepared to present effective testimony. And, Fisher asserts that his trial counsel should have also sought permission to retain a psychiatrist to testify about the combined effects of alcohol and cocaine on Fisher's behavior and to testify, as did Dr. Hoover, that Fisher was in an alcohol or

18

drug-induced blackout during the murder, incapable of making or carrying out a murderous plan. With regard to the sentencing issues, Fisher complains because his counsel did not have either Dr. Hoover or a psychiatrist testify, in the words of the N.C. Gen. Stat. § 15A-2000(f)(6), that Fisher's "capacity . . . to appreciate the criminality of his conduct [and] to conform his conduct to law was impaired" by his alcohol and cocaine use. Had counsel done so, Fisher asserts, there is a reasonable probability that the evidence would have changed the jury's determination as to the existence of the (f)(6) mitigating circumstance and the weight given to both the (f)(2) and the (f)(6) mitigating circumstances, resulting in a sentence other than death.

Again, we cannot say that the state court unreasonably rejected Fisher's claims in this regard. Prior to trial, Fisher sought and obtained permission to retain a clinical psychologist, Dr. Hoover, to evaluate Fisher. Although Dr. Hoover, as a result of a miscommunication with trial counsel's office, did not begin his evaluation as early as he would have preferred, he was able to meet with Fisher on three separate occasions, evaluate him in time to testify at the trial, and testify comprehensively at trial on the issue of Fisher's probable mental state on the morning of the murder. As revealed by our previous summary, the testimony that Dr. Hoover gave during the guilt phase was clearly competent and more than sufficient to allow for the submission of the voluntary intoxication defense and the (f)(2) and (f)(6) mitigating circumstances to the jury. During the trial, Dr. Hoover never told Fisher's counsel that he felt unprepared or uncomfortable with his testimony and, at the evidentiary hearing on Fisher's MAR, Dr. Hoover stood by the opinions that he had offered at the trial. Indeed, the jury found the existence of the (f)(2) mitigating circumstance, at least in part based upon the testimony of Dr. Hoover. The proposed additional testimony by a "psychiatrist" would have been, for the most part, cumulative to the opinions offered by Dr. Hoover and is certainly not so critical, viewed in the context of the other evidence, as to have had any probability of changing the outcome of the jury's verdict.

In summary, the jury rejected the voluntary intoxication defense, concluding that Fisher was capable of deliberating and premeditating the murder, and consistent with this conclusion, proceeded to find the existence of every mitigating circumstance submitted, with the excep-

19

tion of the (f)(6) mitigator. The evidence supporting the jury's conclusion that Fisher was able to premeditate and deliberate the murder, as well as to appreciate the criminality of his conduct and to conform his conduct to the law, was simply overwhelming. See Strickland, 466 U.S. at 696 (stating that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support"). And, we certainly cannot say the state court was unreasonable in its determination that counsel's presentation of the expert testimony was not deficient and that, in any event, there was no reasonable probability that the additional testimony would have changed the outcome of the jury's verdict or sentencing recommendation.

C.

Fisher raises two additional claims, contending that trial counsel was constitutionally ineffective in failing to have Dr. Hoover offer an expert opinion to the effect that Fisher would adjust well to incarceration and in failing to introduce Angela's statement, given between the time that Fisher first assaulted her and the time that he returned and murdered her, that Fisher's conduct that evening was out of character for him. The State claims that Fisher failed to timely or specifically raise these claims before the state court and, therefore, has either defaulted or waived his ability to raise them here. We need not decide whether Fisher has procedurally defaulted or otherwise waived these claims, however, because we independently conclude that he has failed to establish ineffective assistance of counsel based upon the alleged failures.

During the sentencing phase of trial, Fisher's counsel presented the testimony of Lieutenant Murphy, with the Forsyth County Sheriff's Department, that during Fisher's incarceration while awaiting trial, Fisher's attitude had been good, that he had incurred no disciplinary infractions, and that he had regularly participated in Narcotics Anonymous. Counsel also presented uncontradicted evidence that Fisher had no prior criminal record and no significant history of violence or other criminal activity. Additionally, counsel presented the testimony of several witnesses who confirmed that Fisher's mother had suffered with an alcohol problem and that Fisher enjoyed a good relationship with his son. No doubt as a result of this evidence, members of the

20

jury explicitly recognized, as a statutory mitigating circumstance, that Fisher "ha[d] no significant history of prior criminal activity," N.C. Gen. Stat. § 15A-2000(f)(1), and as non-statutory mitigating circumstances, that Fisher's conduct in the jail had been without disciplinary problems and that he had participated in Narcotics Anonymous while incarcerated. However, the jury ultimately concluded that these three mitigating circumstances, and five additional ones, were insufficient to outweigh the two aggravating circumstances which they had unanimously found to exist.

Considering all the circumstances, we cannot say that trial counsel's representation fell below an objective standard of reasonableness simply because he did not present, in addition to the uncontradicted testimony and other evidence of Fisher's non-violent nature and good adjustment to incarceration, the cumulative statement by Angela to the effect that Fisher's violence that evening was out of character for him and an opinion by Dr. Hoover that Fisher would adjust well to incarceration. But even if we were to conclude that Fisher's counsel should have introduced this additional evidence, Fisher would still not be entitled to relief because we are again satisfied that there is no "reasonable probability that, absent the [alleged] errors, the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.

D.

In conclusion, we are satisfied that Fisher's counsel's presentation of lay testimony, expert testimony and other evidence in support of Fisher's intoxication defense, as well as the associated mitigating factors, was not deficient. Indeed, although ultimately unsuccessful, counsel was successful in establishing numerous mitigating circumstances for the jury to weigh against the aggravating circumstances it also found.

Nevertheless, even were we to assume that Fisher's counsel should have presented the additional testimony and other evidence in support of mitigation, we would still conclude, as the state court did, that there was no actual prejudice to Fisher. Fisher brutally murdered his girlfriend and the mother of his child several hours after she fled his initial assault upon her. He secured a knife, walked miles to her home,

21

stabbed her a total of thirty-two times, and broke her jaw and cheek -- all in the presence of her mother, her thirteen-year-old daughter, and their four-year-old son. During the prolonged assault, Fisher dragged Angela naked and bleeding into the yard, where he continued to stab, hit and kick her until Simmons fired a gun and scared him off. In the process, Fisher also stabbed Angela's daughter. Not surprisingly, Fisher's jury found both that Fisher committed the murder while engaged in a burglary, see N.C. Gen. Stat. § 15A 2000(e)(5), and that the murder was "especially heinous, atrocious, or cruel," see N.C. Gen. Stat. § 15A-2000(e)(9). Fisher's jury also found that these aggravating circumstances outweighed the substantial mitigating evidence that his counsel presented and which had resulted in their finding of eight mitigating circumstances.

When we consider the totality of the additional mitigating evidence, which Fisher now asserts was improperly withheld from the jury's consideration, in combination with the substantial mitigating evidence that counsel did present, we are satisfied that "there is [no] reasonable probability that, absent the [alleged] errors, the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." See Strickland, 466 U.S. at 695; see also Williams, 120 S. Ct. at 1515 (noting that state court should "evaluate the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- in reweighing it against the evidence in aggravation"). Accordingly, Fisher is not entitled to habeas relief by the federal court on the basis of ineffective assistance of counsel.

E.

Finally, we briefly address Fisher's assertion that he should have been afforded an evidentiary hearing in the district court on his ineffective assistance of counsel claims. We conclude that the district court did not err in denying this request.

Under 28 U.S.C.A. § 2254(e)(2), a district court may not hold an evidentiary hearing on an applicant's habeas claims if the applicant "failed to develop the factual basis of a claim" during the state court proceedings unless the applicant can establish the existence of a statu-

22

tory exception.**3** Id.; see also Williams v. Taylor, 120 S. Ct. 1479 (2000). When the state court has denied the habeas applicant the opportunity to develop his claims, however, the district court may hold an evidentiary hearing, provided the petitioner "alleges additional facts that, if true, would entitle him to relief" and establishes one of six factors set out by the Supreme Court in Townsend v. Sain, 372 U.S. 293, 312 (1963). Cardwell v. Green, 152 F.3d 331, 338 (4th Cir. 1998) (also recognizing that "[i]f . . . the applicant has not `failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under Townsend." (citation omitted) (internal quotation marks omitted)).

Fisher contends, first, that § 2254(e)(2) did not prohibit an evidentiary hearing before the district court because he did not fail to develop the factual basis of his claims in state court. Second, Fisher asserts that he made the requisite showing under Townsend, and in particular, that he established four of the Townsend factors: (1) that "the merits of the factual dispute were not resolved in the state hearing;" (2) that "the state factual determination is not fairly supported by the record as a whole;" (3) that "the fact-finding procedure

_____

**3** The full text of Section 2254(e)(2) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on --
>
>   (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2). Fisher does not assert that a statutory exception is applicable here.

23

employed by the state court was not adequate to afford a full and fair hearing;" and (4) that "the state trier of fact did not [otherwise] afford [him] a full and fair fact hearing." Townsend, 372 U.S. at 313. We disagree.

First, we note that while Fisher may be correct in his assertion that he has not "failed to develop" -- as best he could -- the factual basis of his claims in state court, he has not demonstrated that he was in any way prohibited in his attempts to develop those claims. In fact, Fisher candidly admits that the state court conducted a full evidentiary hearing on the ineffective assistance of counsel claims raised in his MAR, at which time he was afforded the opportunity to present live witnesses and other evidence in support of those claims. After the hearing, which lasted three days, Fisher was allowed to amend his MAR to conform to the evidence presented. And, Fisher has asserted that the facts which he was afforded the opportunity to develop during the state hearing are sufficient to demonstrate that he received constitutionally ineffective assistance of counsel.

Second, we reiterate that the fact that § 2254(e)(2) did not prohibit the district court from conducting an evidentiary hearing on his claims does not translate to a conclusion that Fisher was entitled to a hearing. In support of his claim that he has established entitlement to a hearing under Townsend, Fisher merely revives his earlier claim that the state court did not resolve his sentencing claims at all, and adds a nonspecific allegation that the state evidentiary hearing was not a "full and fair" one. However, there is no indication that Fisher was afforded anything less than a full and fair hearing in the North Carolina state court in which to pursue his ineffective assistance of counsel claims and he has not alleged that he was in any way prevented in his efforts to substantiate his claims. He has failed to make even a minimal showing to "rebut[ ] the presumption of correctness" of the state court's factual findings, much less by the "clear and convincing evidence" required by § 2254(e)(1), and Fisher has pointed to no additional facts or evidence that he would have presented, or, for that matter, that he now wishes to present. Accordingly, we hold that the district court did not err in refusing to grant Fisher an evidentiary hearing in federal court.

24

IV.

Fisher's final contention is that his death sentence should be reversed because the trial court's instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance, see 15A N.C. Gen. Stat. § 15A-2000(e)(9), was unconstitutionally vague in contravention of the Eighth and Fourteenth Amendments to the United States Constitution. Because Fisher did not challenge the constitutionality of this aggravating circumstance in his direct appeal to the North Carolina Supreme Court, however, the state MAR court ruled that the claim was procedurally defaulted under N.C. Gen. Stat. § 15A-1419(a)(3)(1999). Id. (stating that a motion for appropriate relief may be denied when "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so").

On habeas review, the federal court is precluded from reviewing the merits of a claim that was procedurally defaulted under an "independent and adequate" state procedural rule,"unless the [applicant] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."**4** Coleman v. Thompson, 501 U.S. 722, 750 (1991); see also Harris v. Reed, 489 U.S. 255, 262 (1989). A state rule is "adequate" if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and "independent" if it does not "depend[ ] on a federal constitutional ruling." Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

On appeal, Fisher asserts that the state court did not review and reject the claim based upon an "independent and adequate" state law ground and that, even if it did, he has shown cause and prejudice for the default. We reject both claims.

_____

**4** Fisher does not assert that our failure to consider his heinousness claim will result in a fundamental miscarriage of justice, and we agree that it would not.

25

A.

We begin with Fisher's assertion that the North Carolina state court did not reject his constitutional challenge to the jury instruction on the basis of an "independent and adequate" state law ground. At the outset, we point out that N.C. Gen. Stat. § 15A-1419(a)(3) is generally an independent and adequate state law ground for finding that a claim has been procedurally defaulted. See Williams v. French, 146 F.3d 203, 209 (4th Cir. 1998) (holding that "§ 15A-1419(a)(3) is an independent and adequate state ground" for a state court's finding of procedural default), cert. denied, 119 S. Ct. 1061 (1999). Fisher does not seriously contend otherwise. Rather, he asserts that the statute cannot operate as an "independent and adequate" state law ground for procedural default in his case because, pursuant to N.C. Gen. Stat. § 15A-2000(d)(1) and (2), the North Carolina Supreme Court was required to conduct an "automatic review" of his death penalty which would have encompassed the claim he now specifically raises. In particular, Fisher points to the North Carolina statutory provisions which required the North Carolina Supreme Court (1) to "consider the punishment imposed as well as any errors assigned on appeal," N.C. Gen. Stat. § 15A-2000(d)(1); and (2) to overturn the death sentence if the court determined that "the record [did] not support the jury's findings of any aggravating circumstance or circumstances," that "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," or that "the sentence of death [was] excessive or disproportionate to the penalty imposed in similar cases," N.C. Gen. Stat. § 15A-2000(d)(2). As a result of these provisions, the argument goes, the North Carolina state court was statutorily required to review the substance of the constitutional challenge to the (e)(9) aggravating circumstance which Fisher now pursues and, thus, the review was not independent of federal law. We disagree.

In Mu'Min v. Pruett, 125 F.3d 192 (4th Cir. 1997), we rejected a similar claim that the Virginia Supreme Court implicitly considered and rejected a habeas applicant's constitutional claims during its mandatory review of the applicant's death sentence because the mandatory review procedures only required the Virginia Supreme Court to determine "whether the imposition of the death penalty was influenced by improper considerations," and not to "examine the record for constitutional errors not specified on appeal." Id. at 197; see

26

Kornahrens v. Evatt, 66 F.3d 1350, 1362-63 (4th Cir. 1995) (holding that South Carolina's prior practice of in favorem vitae review did not preserve otherwise defaulted claims); see also Bennett v. Angelone, 92 F.3d 1336, 1345 n.6 (4th Cir. 1996) (noting that "the spirit of Kornahrens is counter" to the notion that the Virginia mandatory review procedure preserves claims not raised on direct appeal). Like Virginia's mandatory review provision, N.C. Gen. Stat. § 15A-2000(d) imposes no requirement that the court search the record for errors not pursued on direct appeal. Accordingly, we conclude that North Carolina rejected Fisher's challenge to the jury instruction on the basis of the adequate and independent state procedural rule set forth in N.C. Gen. Stat. § 15-A-1419(a)(3).

B.

Fisher next argues that, even though he procedurally defaulted the claim in state court, we may nevertheless review its merits on federal habeas because he can demonstrate cause and prejudice to overcome the default. Specifically, he asserts that his counsel was constitutionally ineffective in failing to pursue a challenge to the "heinous, atrocious, or cruel" jury instruction on direct appeal to the Supreme Court of North Carolina. We disagree.

The Sixth Amendment right to effective assistance of counsel extends to require such assistance on direct appeal of a criminal conviction. See Evitts v. Lucey, 469 U.S. 387, 396 (1985). Therefore, Fisher can demonstrate cause for his procedural default based on ineffective assistance of counsel if he can satisfy the oft-recited test set forth in Strickland v. Washington. See Coleman, 501 U.S. at 753-54. As with all ineffectiveness claims, Fisher must demonstrate that his "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. In reviewing a claim that appellate counsel was ineffective, we accord counsel the "presumption that he decided which issues were most likely to afford relief on appeal," Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993), and we do not obligate counsel to assert all non-frivolous issues on appeal, see Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989). Rather, "[w]innowing out weaker arguments on appeal

27

and focusing on those more likely to prevail, far from evidence of incompetence, is the hallmark of effective appellate advocacy." Id. (internal quotation marks omitted).

It has long been settled that a state's capital sentencing scheme may not allow for the imposition of the death penalty in an arbitrary and capricious manner. See Furman v. Georgia, 408 U.S. 238 (1972). The state "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," which includes a responsibility to "define the crimes for which death may be the sentence in a way that obviates `standardless [sentencing] discretion.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (quoting Gregg v. Georgia, 428 U.S. 153, 196 n.47 (1976) (alteration in original). The "capital sentencing scheme must, in short, provide a `meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.'" Id. (quoting Gregg, 428 U.S. at 188) (alteration in original).

In the case of statutory aggravating circumstances in a capital punishment scheme, a circumstance may be so vague as to provide no such meaningful basis for distinguishing a death penalty case from other murders and, thereby, run afoul of the Eighth Amendment prohibition against the imposition of cruel and unusual punishment. Such "[c]laims of vagueness . . . characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in Furman." Maynard v. Cartwright, 486 U.S. 356, 361-362 (1988) (holding that Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague); see also Godfrey, 446 U.S. at 428-29 (holding that Georgia's "outrageously or wantonly vile, horrible or inhuman" circumstance was also invalid). Thus, the Supreme Court has "insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." Maynard, 486 U.S. at 362.

A statutory circumstance that is alone too vague to provide meaningful guidance to the sentencer may be accompanied by a limiting

28

instruction which does provide sufficient guidance. See Shell v. Mississippi, 498 U.S. 1, 1-3 (1990) (holding that a limiting instruction which defined the terms "heinous, atrocious, or cruel" in equally vague language was not constitutionally sufficient); Walton v. Arizona, 497 U.S. 639, 653 (1990) (noting that in Maynard and Godfrey, "the jury either was instructed only in the bare terms of the relevant statute or in terms nearly as vague"). Consequently, when reviewing a state court's application of a statutory aggravating circumstance, we "must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer." Walton, 497 U.S. at 654. If so, we must then proceed "to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide some guidance to the sentencer." Id.

With these principles in mind, we turn to North Carolina law and the instruction given by the trial court at the conclusion of the sentencing phase of Fisher's trial. Under North Carolina law, a person may be sentenced to death if the jury finds, as an aggravating circumstance, that "[t]he capital felony was especially heinous, atrocious, or cruel." 15A N.C. Gen. Stat. § 15A-2000(e)(9). Fisher's jury was presented with this statutory, aggravating circumstance for consideration, along with the following limiting instruction:

> The next issue is "the capital felony was especially heinous, atrocious or cruel." Now in this context heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile and cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. However, it is not enough that this murder be heinous, atrocious or cruel as these terms have just been defined. This murder must have been especially heinous, atrocious or cruel and not every murder is especially so. For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing or this murder must have been. . . a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

29

(Transcript, Vol. IV. at 96). At the time of Fisher's appeal to the North Carolina Supreme Court, this limiting instruction, taken from the North Carolina Pattern Jury Instructions, had already been subjected to a vagueness challenge before that court. See State v. Syriani, 428 S.E.2d 118, 140-41 (N.C. 1993). The court rejected the challenge, holding that "[b]ecause the[ ] jury instructions incorporate narrowing definitions adopted by this [c]ourt and expressly approved by the United States Supreme Court, or are of the tenor of the definitions approved, we reaffirm that the[ ] instructions provide constitutionally sufficient guidance to the jury." Id. at 141.

Relying primarily upon Maynard, Fisher now raises the identical challenge in his federal habeas application, asserting that North Carolina's "heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally vague, that the limiting instruction does not sufficiently channel the jury's discretion in recommending the death penalty, and that his appellate counsel was constitutionally deficient in failing to pursue this challenge before the North Carolina Supreme Court on direct appeal.

Although Fisher is correct in his assertion that North Carolina's "especially heinous, atrocious, or cruel" aggravating circumstance, standing alone, is unconstitutionally vague, see Maynard, 486 U.S. at 364 ("To say that something is `especially heinous' merely suggests that the individual jurors should determine that the murder is more than just `heinous,' whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life is `especially heinous.'"); see Smith v. Dixon, 14 F.3d 956, 974 (4th Cir. 1994) (en banc) (recognizing that North Carolina's "heinous, atrocious, or cruel" aggravating circumstance requires a limiting construction), this does not end our inquiry. In its prior precedents, the Supreme Court has had occasion to consider the constitutionality of certain limiting constructions of the "especially heinous, atrocious, or cruel" aggravating circumstance. For example, the Court has recognized that a construction limiting the phrase to crimes involving "torture or serious physical abuse" provides adequate guidance to the sentencer, Maynard, 486 U.S. at 365, as does a construction requiring a finding that the murder was a "conscienceless or pitiless crime which [was] unnecessarily tortuous to the victim," Proffitt v. Florida, 428 U.S. 242, 255-56 (1976) (internal quotation marks omitted). The

30

Court has disclaimed, however, the suggestion that "some kind of torture or serious physical abuse is the <u>only</u> limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable." <u>Maynard</u>, 486 U.S. at 365 (emphasis added). Rather, as stated previously, the question is whether the state court's limiting construction "provide[s] <u>some</u> guidance to the sentencer," such that their discretion is not boundless. <u>Walton</u>, 497 U.S. at 654.

Fisher's jury was also given a limiting instruction which, after defining the individual terms of the aggravating circumstance, emphasized to the jury that not every murder is "especially heinous, atrocious, or cruel" and that, in order to find this aggravating circumstance, the jury must further conclude that any brutality which was involved in the murder must have exceeded that which is normally present in any killing or that the murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim. Thus, the jury was not left with the bare terms of the statute, or with definitions equally vague. Rather, it was provided with a limiting construction which required the jury to make additional findings in order to distinguish Angela's murder from all others and, therefore, provided the meaningful guidance required to ensure that Fisher's death sentence was not imposed in an arbitrary or capricious manner. We are satisfied that it was not, and that the limiting instruction served its purpose.

At a minimum, however, we are confident that Fisher's appellate counsel was not constitutionally deficient for failing to challenge the instruction on direct appeal, particularly given the North Carolina precedent already rejecting such a claim, <u>see Syriani</u>, 428 S.E.2d at 141, and that, given the gruesome facts underlying Angela's murder, there is no "probability sufficient to undermine our confidence that if his attorney had presented this claim the result of the proceeding would have been [different]," <u>Smith</u>, 14 F.3d at 974. Accordingly, Fisher has also failed to demonstrate cause for his procedural default of the heinousness claim and is not entitled to habeas relief in the federal courts. <u>See Coleman</u>, 501 U.S. at 753-54.

V.

For the foregoing reasons, we conclude that Fisher has failed to make a substantial showing of the denial of a constitutional right. <u>See</u>

31

28 U.S.C.A. § 2253(c)(2). Accordingly, we deny Fisher's request for a certificate of appealability and dismiss the appeal.

<u>DISMISSED</u>

32