STATE OF NORTH CAROLINA v. CLIFTON ALLEN WHITE

No. 468A90

(Filed 25 June 1992)

**1. Evidence and Witnesses § 345 (NCI4th) — prior sexual assault — admissible to show intent in burglary case — erroneous instruction**

In a prosecution for first degree kidnapping, first degree murder, second degree burglary, armed robbery, and larceny of an automobile, testimony by a witness concerning a sexual assault committed on her by defendant ten days before the crimes in question was relevant and admissible to support the prosecution's theory in the burglary case that defendant entered the victim's home with the intent to commit first degree rape or first degree sexual offense where there were substantial similarities between the two alleged sexual assaults in that both the witness and the victim were young women in their late twenties whom defendant knew casually through friends; neither of the women had a previous sexual relationship with defendant; defendant went to the woman's home in each instance; defendant used a box cutter in his attack on the witness and a knife in his attack on the victim; defendant admitted that the victim performed fellatio upon him; and this was the same type of sexual activity that defendant allegedly forced the witness to commit. However, the jury should have

STATE v. WHITE

[331 N.C. 604 (1992)]

been instructed to disregard testimony about the prior sexual assault when the trial court refused to instruct the jury on second degree burglary on the basis of a sexual assault, and the court erred in giving the jury an instruction which may have led the jury to conclude erroneously that it could consider evidence of the prior sexual assault for the purpose of proving that defendant had the intent to commit any of the crimes with which he had been charged.

**Am Jur 2d, Evidence §§ 298-301, 363, 364, 366.**

2. **Evidence and Witnesses §§ 299, 887 (NCI4th)— prior sexual assault—triple hearsay—impeachment—prejudicial effect outweighing probative value**

In a prosecution for murder, kidnapping, armed robbery, larceny, and second degree burglary based on an intent to commit a sexual assault, a witness's triple hearsay testimony during cross-examination by the State about a seventeen-year-old girl's allegation that defendant had previously sexually assaulted her was not admissible for substantive purposes to prove that the sexual assault occurred or for impeachment purposes. Even assuming that the State's cross-examination was relevant for impeachment purposes as tending to show that the witness was biased in favor of defendant and would not have believed anyone who made a claim of sexual assault against defendant, this testimony should have been excluded under Rule of Evidence 403 on the ground that its probative value was substantially outweighed by its danger of unfair prejudice to defendant where the jury was given no limiting instruction, and this testimony exacerbated the prejudicial effect of other prior sexual assault evidence for which the jury was given defective instructions permitting its consideration for the purpose of proving intent for any of the crimes charged.

**Am Jur 2d, Evidence § 493.**

3. **Constitutional Law § 252 (NCI4th); Criminal Law § 109 (NCI4th)— appointment of defense psychiatric experts—requiring reports to prosecutor—use of reports at sentencing—harmless error**

The trial court erred in requiring court-appointed defense psychiatric experts to prepare and submit to the prosecutor written reports of their evaluations of defendant as a condition

of their appointment where the court's order was not limited to disclosure of results or reports intended to be introduced at trial or related to the testimony of an expert whom defendant intended to call as a witness at his trial. However, defendant was not prejudiced by this error where defendant relied at the sentencing hearing upon the results and reports of the mental examinations and tests conducted by the court-appointed experts, and consequently the State would have been entitled to pretrial discovery of these reports. N.C.G.S. § 15A-905(b).

**Am Jur 2d, Criminal Law § 67.**

4. **Criminal Law § 109 (NCI4th) — discovery by State — mental examination reports — intent to use in guilt-innocence or sentencing phase**

Under N.C.G.S. § 15A-905(b), results or reports of mental examinations or tests conducted by defense experts are subject to pretrial discovery by the State as long as such information or the experts are intended to be relied upon by the defendant at *either* the guilt-innocence or the sentencing phase of his trial.

**Am Jur 2d, Criminal Law § 67.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by *Burroughs, J.*, at the 17 August 1990 Criminal Session of Superior Court, MECKLENBURG County, upon the jury's recommendation following its verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional convictions and sentences imposed thereon was allowed by this Court on 1 October 1991. Heard in the Supreme Court 11 March 1992.

*Lacy H. Thornburg, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Thomas K. Maher for defendant-appellant.*

MEYER, Justice.

Defendant was indicted for the first-degree kidnapping and first-degree murder of Kimberly Ewing as well as second-degree burglary, robbery with a dangerous weapon, and larceny of an automobile. Defendant was tried capitally and was found guilty

of first-degree murder on the theories of murder committed with premeditation and deliberation and murder perpetrated by lying in wait; the jury also found defendant guilty of first-degree kidnapping, second-degree burglary, robbery with a dangerous weapon, and felonious larceny of an automobile. Following a sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of death for the first-degree murder conviction. In accordance with the jury's recommendation, the trial court sentenced defendant to death for the murder of Ewing and imposed consecutive sentences of imprisonment of forty years each for first-degree kidnapping, second-degree burglary, and robbery with a dangerous weapon, as well as a consecutive sentence of ten years' imprisonment for felonious larceny of an automobile.

The evidence presented at trial tended to show that defendant had known Ewing for two weeks before her death. They met through Wendy Gibson, Ewing's roommate, whom defendant had met at a bar around the same time. Defendant and Gibson became friends, and defendant often visited Gibson at Ewing's home. Ewing had seen defendant on three or four occasions during the two-week period.

On the evening of Friday, 5 May 1989, defendant was visiting Gibson at Ewing's home when Angela and Teddy Owens, friends of Ewing and Gibson, came to visit. They decided to go dancing, and Gibson unsuccessfully attempted to get off work. Defendant went with Ewing and the Owenses so that Ewing would have someone with whom to dance. While at a party late in the evening or early the next morning, Ewing became upset with defendant and accused him of giving some syringes to one of her friends who had a serious drug problem.

Around 3:00 a.m., defendant left the party and went to visit Gibson at the Waffle House where she worked. He explained to her that he had gotten into an argument with Ewing over the syringes. About an hour later, Ewing came to the Waffle House. Defendant and Ewing again began arguing but eventually stopped. When Gibson completed her work shift at 7:00 a.m., the three then left and went back to Ewing's house. Gibson and Ewing went to their respective bedrooms, and defendant slept on the couch.

Upon awaking at 11:00 a.m., Ewing told defendant to leave. Gibson testified at trial that Ewing and defendant talked and that Gibson thought that the argument had been resolved. Defendant apparently stayed at the house until defendant, Gibson, and Ewing

left to go to a bar around 2:00 that afternoon. The three drank at several bars and returned to Ewing's home at 8:00 that evening.

Around 10:00 p.m., Ewing, Gibson, and defendant left the house in Ewing's car, with Ewing driving. At defendant's request, Ewing left defendant at a convenience store about two miles from the house. Ewing then drove Gibson to work at the Waffle House. Ewing left the Waffle House for about ten minutes, then returned to eat dinner. Ewing stayed at the Waffle House until 11:30 p.m. or 12:00 midnight, when she left to go home.

Sometime before 11:00 that evening, defendant took a taxi cab from the convenience store to the street where Ewing's house was located. Defendant, who had been drinking, told the cab driver that his wife had left him and had taken everything and that she was not home but that he would wait for her to "kick her ass" and kill her. Defendant then told the cab driver that he would take her VCR and obtain some cocaine to pay him for the cab fare. The cab driver declined defendant's offer and left.

Around 11:00 a.m. the next morning, Gibson returned home to find the house in disarray. She walked into Ewing's room where she found Ewing dead, naked and lying on the floor. Her head was covered in blood, and her hands were tied behind her back with an electrical cord. Ewing had been cut and stabbed in the neck and beaten over the head with a blunt object. Two brass fireplace tools lay on the floor above Ewing's head. Her legs were spread apart, and blood and excrement covered her legs. One investigating officer noticed a "white matter" around Ewing's vaginal area, and excrement was also found on Ewing's bed. Several items, including Ewing's car, a stereo, a television, a VCR, a microwave, and a paring knife, were missing from the house. The paring knife was later found, stained with blood matching Ewing's blood type, in the vicinity of Ewing's home.

Earlier, around 5:00 a.m. that same morning, defendant drove Ewing's car to a friend's house. In the car, defendant had a microwave, a stereo, some clothing, and jewelry. He explained to his friends that he had broken up with his girlfriend and had taken some of her belongings. Defendant traded the microwave and VCR for some cocaine, which he smoked, then left driving Ewing's car.

A few weeks after Ewing's death, defendant was arrested in Florida for breaking or entering. He told an officer, "I got something to tell you that's driving me crazy." In a tape-recorded interview, defendant then told the officers that he "got drunk . . . and got messed up on some drugs," that he went to Ewing's house to wait for her, and that he "jumped on her and . . . tied her hands behind her back and killed her." Defendant explained that he did not know what caused him to kill her, that he was "stoned" and "mad" and that his "mind just snapped."

Defendant later gave another statement to two Charlotte police officers. Defendant told the officers that he was angry and went to Ewing's house to "slap the girl," that the door was locked so he walked around the house and climbed in an open window. Defendant stated:

> When she came in, I was standing in the living room and it startled her at first. And I grabbed her and . . . I started cussing her out. I . . . called her a sorry bitch for blaming everything on me, making me look like a fool in front of everybody and I was mad and drunk. And she kept telling me . . . that she was sorry she done it and everything.
>
> Then she started playing with my chest and messing with me and picking with me and I guess trying to calm me down . . . .

According to defendant, Ewing took her clothes off and performed fellatio. Defendant began thinking about their prior argument, became angry, and told Ewing, "[p]ut your hands behind your back," "I'm just gonna tie your hands behind your back and beat your ass and I'm gonna leave." Defendant stated that he then tied Ewing's hands, got a shovel, and

> popped [Ewing] in the back of the head with it. . . . [T]here was a knife on the dresser and I grabbed her knife and I come down. I know I cut her.
>
> . . . .
>
> . . . I hit her and I come back again. . . . [S]he rolled back over . . . [a]nd when she did that's when I stuck the knife in the back of her neck and she quit moving.

Throughout the trial, defense counsel proceeded on the theory that defendant did not lie in wait or act with premeditation and deliberation in the killing. Defendant admitted killing Ewing but

maintained that he did so "in a frenzy and a passion and in a drug induced, alcohol induced, kind of furry [sic]" that came about when an argument erupted between defendant and Ewing. Defendant testified that he had been on a "cocaine binge" for three or four days prior to the weekend of Ewing's death and that he was "pretty wrecked" the night of the killing. He went to Ewing's house to make sure Ewing was not mad at him and to ask if he could sleep on her couch because he was drunk and did not think he could make it home. Defendant testified that he waited on the back porch for a period of time, then walked up a flight of stairs outside the house to Gibson's room and opened the door with a key Gibson had given him. Once inside, he walked downstairs to the living area, sat on the couch listening to music, smoked some marijuana, and began thinking about the argument he had with Ewing. Defendant stated that he became angry and decided to get even with Ewing by taking her television. Defendant had moved the television to the floor when Ewing walked in, and the two began to argue.

Defendant testified that he slapped Ewing, that they began hitting each other, and that he followed Ewing into her bedroom and they calmed down. According to defendant, Ewing changed into a robe and the two began talking. Defendant testified that Ewing performed fellatio, that they again talked, and that he killed Ewing when another argument erupted and Ewing swung and hit defendant in the head with a roller skate. Defendant testified, "And that's when I grabbed the knife. The knife was sitting right there on the night stand. And I grabbed the knife and I cut her." Defendant stated that he did not know if he "passed out or . . . just blacked out or what," but everything after that point was a "blur." Defendant testified that he did not remember tying Ewing's hands, hitting her with any object, or taking and disposing of Ewing's belongings.

I.

Defendant assigns error to several rulings made by the trial court concerning evidence of prior bad acts allegedly committed by defendant. We agree with defendant that the trial court's rulings with regard to this evidence were erroneous in two respects. Although neither of the trial court's errors, when considered in isolation, might have been sufficiently prejudicial to warrant a new trial, we are of the opinion that cumulatively they are sufficiently

prejudicial that we are unable to say that defendant received a fair trial, and therefore a new trial is required.

[1] Defendant first argues that the trial court erred in permitting Darlene Hamrick to testify for the State concerning a prior sexual assault allegedly committed by defendant. Following a voir dire, the trial court ruled that the evidence of the prior sexual assault of Hamrick was relevant and admissible under Rule 404(b) of the North Carolina Rules of Evidence to prove defendant's motive or intent and that the evidence should not be excluded under Rule 403 of the North Carolina Rules of Evidence. Thereupon, Hamrick testified that she was a neighbor of defendant's sister and that ten days prior to Ewing's death, Hamrick and Karen, a friend of Hamrick's, had driven defendant to buy some cocaine. Upon returning, Hamrick went to her apartment, and defendant and Karen went to defendant's sister's apartment. Hamrick stated that she needed to talk with Karen so she walked over to defendant's sister's apartment twice during the evening to see if Karen was going to Hamrick's apartment. Hamrick further testified that defendant came to her apartment later that evening, told Hamrick that Karen was coming over, and asked if he could come into Hamrick's apartment. Hamrick and defendant talked for a period of time, then she asked defendant to leave because it was getting late. According to Hamrick, defendant then straddled her and forced her to commit fellatio as defendant held a box cutter blade to her throat. Defendant maintains that the evidence of the alleged sexual assault against Hamrick was irrelevant and not admissible to prove intent or motive under Rule 404(b).

The State argues, and we agree, that this evidence was relevant, probative, and admissible at the time the testimony was presented by the State. Under Rule 404(b), evidence of other crimes, wrongs, or acts is inadmissible if its *sole* relevancy is to show the defendant's character or his propensity to commit an offense with which he is charged. N.C. R. Evid. 404(b); *State v. Jeter*, 326 N.C. 457, 389 S.E.2d 805 (1990). Where, however, the evidence tends to prove any other relevant fact, such as an intent or motive to commit a crime charged, the evidence will not be excluded simply because it shows that the defendant is guilty of an independent crime. *Jeter*, 326 N.C. 457, 389 S.E.2d 805; *State v. Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990).

With respect to prior sexual offenses, we have been very liberal in permitting the State to present such evidence to prove any relevant fact not prohibited by Rule 404(b). As we have previously noted,

> our decisions, both before and after the adoption of Rule 404(b), have been "markedly liberal" in holding evidence of prior sex offenses "admissible for one or more of the purposes listed [in Rule 404(b)] . . . ."

*Coffey*, 326 N.C. at 279, 389 S.E.2d at 54 (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 92 (3d ed. 1988)). This is particularly true where the fact sought to be proved is the defendant's intent to commit a similar sexual offense for which the defendant has been charged. *See, e.g., State v. Boyd*, 321 N.C. 574, 364 S.E.2d 118 (1988) (evidence that defendant was found naked in bed with young female relative on prior occasion admissible to demonstrate defendant's intent or scheme to take sexual advantage of young female relatives left in his custody); *State v. Bagley*, 321 N.C. 201, 362 S.E.2d 244 (1987) (evidence of defendant's subsequent attempt to commit sexual offense admissible to rebut defendant's claim that prosecutrix had consented to cunnilingus), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912. (1988).

In this case, defendant had been indicted for second-degree burglary based upon the theory that defendant had entered Ewing's home with the intent to commit, among other offenses, first-degree rape or first-degree sexual offense. To support this charge, the State presented evidence tending to show that Ewing was found naked, with her hands bound behind her back with an electrical cord tied in a triple knot. Although the medical examiner testified that he was unable to detect the presence of any sperm or physical injuries to Ewing's genitalia, he further explained that he was not able to say that no sexual activity had occurred. Blood and fecal material were present on Ewing's bed and body, and one witness observed an unidentified "white matter" around Ewing's vaginal area.

As noted by the trial court, the State's evidence showed substantial similarities between the two alleged sexual assaults. Both Hamrick and Ewing were young women in their late twenties whom defendant knew casually through friends. Neither of the young women had a previous sexual relationship with defendant. As to each instance of alleged sexual assault, defendant went to the vic-

tim's home. The evidence also suggested that defendant made a surprise attack on each victim, restraining her, either by straddling her or by binding her hands. A similar instrument was allegedly used by defendant against each of the women. According to Hamrick, defendant held a box cutter to her neck, threatening to kill her if she did not comply with his orders. Similarly, the evidence in this case showed that defendant brandished a knife with which he cut Ewing's neck several times. Although no forensic evidence was presented to show sexual activity between defendant and Ewing, defendant did admit that Ewing performed fellatio upon him. This was the same type of sexual activity that defendant allegedly forced Hamrick to commit. Given the similarities in the circumstances of the two incidents, the evidence of the sexual assault of Hamrick was relevant and highly probative of defendant's intent to commit a sexual assault against Ewing, and thus we are unable to say that the trial court abused its discretion in admitting this evidence.

The trial court's rulings with regard to this prior sexual assault evidence were not completely without error, however. Immediately after Hamrick's testimony, the trial judge instructed the jury that it could consider Hamrick's testimony as evidence of defendant's intent, without specifying that this evidence was to be considered only with respect to the second-degree burglary charge. At the conclusion of all of the evidence, the trial court, apparently because of concern over the lack of direct evidence to show that defendant sexually assaulted Ewing, concluded that there was insufficient evidence to support the State's theory that defendant broke or entered Ewing's home with the intent to commit rape or a first-degree sexual offense. Accordingly, the trial judge refused to instruct the jury on second-degree burglary on this basis. This may very well have been error favorable to defendant. However, because the testimony of defendant's alleged sexual assault of Hamrick was admitted only for the purpose of proving that defendant entered Ewing's home with the intent to commit a sexual assault upon Ewing, the jury should have been instructed that it should disregard Hamrick's testimony. Nevertheless, the trial court did not instruct the jury to disregard this evidence but instead repeated in substance its earlier instruction, stating:

Now, Members of the jury, in this case, evidence was received, tending to show, and what it does show is for you, the jury, to determine, that the defendant, Clifton White, had an assaultive sexual encounter with Mrs. Hamrick.

This evidence was received solely for the purpose of show-
ing that the defendant had the intent, which is a necessary
element of the crimes charged in this case.

If you believe this evidence, you may consider it only
for the limited purpose for which it was received.

Based on this instruction, the jury may have erroneously concluded
that it could consider the evidence of the sexual assault for the
purpose of proving that defendant had the intent to commit any
of the crimes with which he had been charged.

[2]   Were this the only error concerning evidence of alleged sexual
assaults committed by defendant, we might be inclined to conclude
that the trial court's error did not prejudice defendant. However,
we believe that this error was greatly compounded when evidence
of another alleged sexual assault committed by defendant was elicited
during the State's cross-examination of Brenda Hunt.

During defendant's case-in-chief, Hunt testified that Hamrick
had confided in her about the alleged sexual assault committed
by defendant. According to Hunt, Hamrick said that Hamrick and
one of her friends had promised to have sex with defendant in
exchange for some cocaine, that the three of them went to defend-
ant's sister's apartment "[to do] some drugs," but that Hamrick
left and returned to her own apartment because defendant and
her friend had cheated her out of the last portion of the cocaine.
Hunt further testified that Hamrick told her that defendant came
to Hamrick's apartment and tried to force Hamrick to perform
fellatio. Hunt stated that she encouraged Hamrick to call the police,
and when Hamrick refused, Hunt woke defendant's sister, who
called the police after hearing Hamrick's allegations.

The State then questioned Hunt as follows:

Q. . . . So, why did you tell Officer Horner [that defendant's
sister] called the police?

A. Okay. She, [defendant's sister] did say—

[DEFENSE COUNSEL]: I OBJECT to what [defendant's sister]
said.

THE COURT: OVERRULED.

. . . .

STATE v. WHITE

[331 N.C. 604 (1992)]

A. [Defendant's sister] did say, when I woke her up, she said, "I've heard this before."

Q. What?

A. That he had—Casey had told us or something that [defendant] had tried to rape her or something and that's what I told [the police]; I didn't believe that.

Q. Casey; that's a 17 year old?

A. Yes, sir.

We agree with defendant that the testimony concerning defendant's alleged sexual assault of Casey, the seventeen-year-old, was not admissible under the North Carolina Rules of Evidence. The answer elicited from Hunt was triple hearsay as it was an allegation by Casey to defendant's sister, repeated by defendant's sister to Hunt, and further repeated by Hunt to the police. Because this testimony does not fall within any of the exceptions to the hearsay rule, the evidence was not admissible for substantive purposes—to prove that the sexual assault actually occurred. Nor was this testimony admissible for impeachment purposes. The admissibility of evidence, including that offered for the purpose of impeaching a witness, is governed by Rule 403 of the North Carolina Rules of Evidence, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C. R. Evid. 403. As we have repeatedly stated, the decision to exclude or not exclude relevant but prejudicial evidence is a matter within the sound discretion of the trial court and will be reversed only upon a showing that the trial court abused its discretion. *State v. Baldwin*, 330 N.C. 446, 456, 412 S.E.2d 31, 37 (1992). Evidence that "may reasonably tend to prove two or more facts" but is competent to prove only one of them is not deemed inadmissible simply because the evidence tends to prove some fact that is not relevant or for proof of which the evidence is not competent. 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 79, at 351-52 (3d ed. 1988). If, however, the probative value of the evidence is so slight and the evidence is so prejudicial that there

is a substantial likelihood that the jury will consider the evidence only for the purpose of determining the defendant's propensity to commit the crimes with which he has been charged, the evidence must be excluded under Rule 403. *See State v. Jones*, 322 N.C. 585, 590, 369 S.E.2d 822, 825 (1988) (concluding that evidence of defendant's prior sexual misconduct should have been excluded because "its probative impact ha[d] been so attenuated by time that [the evidence] bec[a]me little more than character evidence illustrating the predisposition of the accused").

Even assuming, as the State argues, that the State's cross-examination was relevant as tending to show that Hunt was biased in favor of defendant and that Hunt would not have believed anyone who made a claim of sexual assault against defendant and thus otherwise might have been admissible for impeachment purposes, we believe that the peculiar circumstances of this case required that the testimony concerning defendant's alleged sexual assault of Casey be excluded under Rule 403. At the time that this testimony was elicited, the jury had already heard extensive and severely damaging evidence suggesting that defendant had committed two sexual assaults — one upon Hamrick and one upon Ewing. Admitting evidence of yet another sexual assault upon Casey, a seventeen-year-old, would surely have tended to exacerbate the prejudicial effect of the other sexual assault evidence and increase the probability that the jury might consider the sexual assault evidence for purposes prohibited by Rule 404. Because the jury was given no instruction limiting its consideration of this evidence and was further given defective instructions concerning the relevance of the Hamrick assault evidence, we believe that any probative value of the evidence of defendant's alleged assault upon Casey was substantially outweighed by the danger that the evidence would predispose the minds of the jurors to believe that defendant was guilty of the crimes charged. Therefore, we conclude that the evidence should have been excluded under Rule 403.

Even assuming that defendant has failed to show that either of the trial court's rulings, considered individually, is sufficiently prejudicial to require a new trial, we believe that the admission of the severely damaging evidence of prior sexual assaults allegedly committed by defendant, when considered in combination, may have deprived defendant of his fundamental right to a fair trial. Thus, we conclude that defendant is entitled to a new trial.

## II.

[3]  Defendant further assigns as error a portion of the trial court's order granting defendant's pretrial motion for the appointment of experts to perform psychiatric and psychological testing of defendant. Because this assignment of error concerns evidence previously disclosed to the State and because the State's right to rely on such evidence at a new trial might be affected, we elect to address this assignment of error.

After conducting a hearing on defendant's motion for the appointment of experts, the trial court found that defendant had demonstrated the need for expert assistance and that he was indigent and could not personally afford to hire such experts. In an order dated 4 May 1990, the trial court granted defendant's motion for the appointment of two experts, at state expense, on the condition that the experts prepare written reports of their evaluations of defendant and that they submit copies of such reports to the trial court and the prosecutor on or before 1 August 1990. Specifically, the trial court ordered that the experts prepare written reports containing "all pertinent information concerning [the experts'] evaluation of the Defendant" and that the experts "make available to the [prosecutor] information including, but not be [sic] limited to, raw data scores, interpretation of raw data scores, observations, and any further information and conclusions concerning the Defendant which is observed by the [experts] and relied upon by the [experts] in arriving at their conclusions concerning the Defendant's prior and current mental state." The trial court's order further provided: "If no written report is filed on or before August 1, 1990, neither [expert] will be permitted to testify . . . nor will they be paid by the State for their services."

We agree with defendant that the trial court erred in requiring the experts to prepare and submit to the prosecutor written reports of their evaluations of defendant. N.C.G.S. § 15A-905, which governs the State's right to pretrial discovery in criminal cases, provides the State with the right to copies only of

> results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case . . . which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, when the results or reports relate to his testimony.

N.C.G.S. § 15A-905(b) (1988). Under this statute, results or reports of a mental examination or test are not discoverable by the State if the defendant intends neither to introduce the reports or the results thereof into evidence at his trial nor to call the expert witness who prepared the items to testify at the defendant's trial with regard to matters related to the mental examination or test. Because N.C.G.S. § 15A-905 "expressly restricts [the State's right to] pretrial discovery, . . . the trial court has no authority to order [greater] discovery." *State v. Hardy*, 293 N.C. 105, 125, 235 S.E.2d 828, 840 (1977); *State v. Crandell*, 322 N.C. 487, 498, 369 S.E.2d 579, 585-86 (1988). In this case, the trial court's order was not limited to disclosure of results or reports intended to be introduced at trial or relating to the testimony of an expert whom defendant intended to call as a witness at his trial. Although not expressly delineated as an order compelling discovery, the trial court's order exceeded the court's authority by effectively granting to the State greater discovery than permitted by N.C.G.S. § 15A-905.

Defendant further maintains that by conditioning payment of the experts' services upon the disclosure of this information, the trial court deprived defendant of his constitutional rights to due process and equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution and Article I, Section 19 of the North Carolina Constitution. Defendant argues that the trial court's order granted to the State discovery greater than that available against defendants who are not indigent and thus deprived defendant of his right to the assistance of independent experts necessary for his defense as recognized by the United States Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985).

Assuming, *arguendo*, that the trial court's error is of constitutional magnitude, we conclude that the State has shown that any error resulting from the trial court's order was harmless beyond a reasonable doubt. When a defendant obtains discovery of like material, the State, upon request, becomes entitled to pretrial discovery of results or reports of mental examinations or tests "which the defendant intends to introduce in evidence at the *trial* or which were prepared by a witness whom the defendant intends to call at the *trial*, when the results or reports relate to his testimony." N.C.G.S. § 15A-905(b) (1988) (emphasis added). Defendant argues that the State is unable to show that it was entitled to pretrial discovery of the defense experts' reports because nothing

STATE v. WHITE

[331 N.C. 604 (1992)]

in the record on appeal or the transcript of the proceedings suggests that defendant intended to rely on this information or the experts' testimony at the *guilt-innocence phase* of his trial and defendant did not do so. We do not agree that the State is required to make such a showing.

[4] In determining the State's entitlement to pretrial discovery under N.C.G.S. § 15A-905(b), the determinative question is whether the defendant intends to rely on such evidence at his *trial*. The term "trial," as used in N.C.G.S. § 15A-905(b), is not restricted to the guilt-innocence phase but encompasses all portions of the defendant's trial, including the sentencing phase. Thus, under N.C.G.S. § 15A-905(b), results or reports of mental examinations or tests conducted by defense experts are subject to pretrial discovery by the State as long as such information or the experts are intended to be relied upon by the defendant at *either* the guilt-innocence phase or sentencing phase of his trial.

At his sentencing proceeding in this case, defendant relied heavily upon the results and reports of the mental examinations and tests conducted by the court-appointed experts. Dr. Billinsky, the psychiatrist appointed to assist defendant in preparing for trial, testified in detail concerning the interviews he conducted as well as the psychological testing conducted by Dr. Varley, the psychologist appointed to assist defendant. Based on information obtained during his personal interviews of defendant and documents submitted to him, including the report prepared by Dr. Varley, Dr. Billinsky testified that at the time of the killing, defendant was suffering from a mixed personality disorder, that defendant was under the influence of some mental or emotional disturbance, and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

The record does not reveal that defendant lodged any objection to discovery by the State on the basis that he did not intend to rely upon this evidence at his trial. Nor has defendant presented any evidence on appeal to support his claim that he did not intend to call Dr. Billinsky at his sentencing proceeding. As noted by the State, all of the evidence of record tends to show that defendant did intend to rely on the experts' reports at the sentencing proceeding. The reports prepared by Drs. Billinsky and Varley were clearly favorable to defendant. Dr. Billinsky's testimony was crucial in defendant's case, as it was the only medical evidence tending

to support two of the statutory mitigating circumstances found by the jury—that defendant committed the murder while under the influence of mental or emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Under these circumstances, we conclude that the State has shown that it was entitled to pretrial discovery of these reports. Therefore, the trial court's order, although erroneous insofar as it required the experts to prepare and submit to the prosecutor written reports of their examinations and testing, did not in any way prejudice the rights of defendant. We overrule this assignment of error.

For the foregoing reasons, we conclude that the admission of evidence relating to alleged sexual assaults committed by defendant was prejudicial to defendant's fundamental right to a fair trial and that defendant is entitled to a new trial on this basis. We do not find it necessary to address defendant's remaining assignments of error because the alleged errors are not likely to recur upon retrial.

New trial.