# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CLIFTON ALLEN WHITE,
　　　　　*Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
　　　　　*Respondent-Appellee.*

No. 00-3

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, District Judge.
(CA-98-543-3-V)

Argued: September 26, 2000

Decided: December 8, 2000

Before NIEMEYER and TRAXLER, Circuit Judges, and
Frederick P. STAMP, Jr., Chief United States District Judge
for the Northern District of West Virginia, sitting by designation.

---

Affirmed by unpublished opinion. Judge Traxler wrote the opinion,
in which Judge Niemeyer and Chief Judge Stamp concurred.

---

## COUNSEL

**ARGUED:** Jonathan Edward Broun, CENTER FOR DEATH PEN-
ALTY LITIGATION, INC., Durham, North Carolina, for Appellant.
Edwin William Welch, Special Deputy Attorney General, NORTH
CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Caro-

lina, for Appellee. **ON BRIEF:** Noell P. Tin, RAWLS & DICKIN-SON, P.A., Charlotte, North Carolina, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

TRAXLER, Circuit Judge:

Clifton Allen White appeals the district court's denial of his petition for writ of habeas corpus, *see* 28 U.S.C.A. § 2254 (West 1994 & Supp. 2000), in which he challenges his conviction in North Carolina state court for the capital murder of Kimberly Ewing. We affirm.

### I.

In May 1989, Clifton Allen White stabbed Kimberly Ewing to death. The North Carolina Supreme Court summarized the evidence as follows:

> The evidence presented at trial tended to show that defendant had known Ewing for about two weeks prior to her death. They met through Ewing's roommate, Wendy Gibson, whom defendant had recently met at a bar. Defendant often visited Gibson at Ewing's home.
>
> On the night of Friday, 5 May 1989, defendant and Ewing went to a party with some friends. At the party, Ewing became upset with defendant for handing some syringes to one of her friends who had a drug problem. Defendant left the party and went to see Gibson at the Waffle House, where she worked. Ewing also went to the Waffle House and again argued with defendant about the syringes. They eventually stopped arguing, and when Gibson got off work, the three

went to Ewing's home. Gibson and Ewing went to their respective bedrooms, and defendant slept on the couch.

The next day, defendant and Ewing again argued, but ultimately seemed to resolve the dispute. The three went to several bars that afternoon and returned to Ewing's home that evening. Around 10:00 p.m., the three left Ewing's home. Ewing took defendant to a convenience store near her home, and then [s]he drove Gibson to the Waffle House for work. Ewing ate dinner at the Waffle House, then left between 11:30 p.m. and midnight to return home.

At around 11:00 p.m., defendant took a taxi cab from the convenience store to the road where Ewing's house was located. Defendant told the cab driver that he was upset with his girlfriend, who had left him and had taken everything, and he was going to "kick ass" and kill her. When defendant got out of the cab, he told the driver that he was going to steal her VCR and sell it for drugs to pay for the cab ride. The driver declined the offer and drove away.

Defendant drove Ewing's car to a friend's house early Sunday morning. He exchanged Ewing's microwave, stereo, speakers, and some jewelry for drugs. He also gave away some of Ewing's clothing. Defendant said that he had argued with his girlfriend and had taken the things that he had bought her. He later drove away in Ewing's car.

Gibson returned home Sunday morning. She discovered that Ewing's car, stereo, television, VCR, and microwave were missing. She then found Ewing dead in her bedroom. Ewing was naked and covered in blood, and her hands were tied behind her back with an electrical cord. Ewing had been cut and stabbed in the neck and beaten over the head with a blunt object. A fireplace shovel was found in her bedroom, and a paring knife was missing from the house.

On 16 May 1989, defendant was arrested in Florida. In a statement to police, defendant said he "got messed up on some drugs" one night and killed his girlfriend's roommate

when she came home. He said he took a cab to Ewing's house, climbed in a window, and waited for her. When she arrived, he tied her hands behind her back. He then hit her in the head with a fireplace shovel and cut and stabbed her with a paring knife, killing her. He took the victim's money and some of her possessions, traded them for cocaine, and drove her car to Florida.

*State v. White*, 471 S.E.2d 593, 596-97 (N.C. 1996). At trial, White did not dispute that he killed Ewing. Rather, he contended that he committed a lesser degree of homicide because the killing occurred during an altercation with Ewing while he was under the influence of alcohol and cocaine and that he never intended to kill her. The jury rejected this defense and convicted White of first-degree murder on the theories of premeditation and deliberation, and of lying in wait. The jury also convicted White of first-degree kidnapping, larceny of an automobile, robbery with a dangerous weapon, and second-degree burglary on the basis of intent to commit larceny.*

At the conclusion of White's capital sentencing proceeding, *see* N.C. Gen. Stat. § 15A-2000 (1999), the court submitted two statutory aggravating factors to the jury: (1) that the murder was committed during the commission of first degree kidnapping, second degree burglary, and robbery with a dangerous weapon, *see* N.C. Gen. Stat. § 15A-2000(e)(5); and (2) that the murder was "especially heinous, atrocious, or cruel," N.C. Gen. Stat. § 15A-2000(e)(9). The jury found both aggravating circumstances to be present. Three statutory mitigating circumstances, six non-statutory mitigating circumstances, and the "catch all" mitigating circumstance were also submitted to the jury. *See* N.C. Gen. Stat. § 15A-2000(f). Seven mitigating factors were found to exist by at least one juror each. However, the jury ultimately concluded that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and recommended a sentence of death. The trial court imposed the death sentence as recommended. In addition, the trial court imposed consecutive forty-year sentences for

---

*White had been previously found guilty of all charges in August 1990 and sentenced to death for the murder of Ewing. On appeal, however, the North Carolina Supreme Court reversed the convictions and remanded for a new trial. *See State v. White*, 419 S.E.2d 557 (N.C. 1992).

first-degree kidnapping, robbery with a dangerous weapon, and second-degree burglary, and a consecutive ten-year sentence for felonious larceny of an automobile.

The North Carolina Supreme Court affirmed White's conviction and death sentence, *see White*, 471 S.E.2d at 605, and the United States Supreme Court denied White's petition for writ of certiorari, *see White v. North Carolina*, 519 U.S. 936 (1996). White then filed a motion for appropriate relief ("MAR"), *see* N.C. Gen. Stat. § 15A-1415 (1999), in the Mecklenburg County Superior Court. Following an evidentiary hearing, the state court denied the MAR and the North Carolina Supreme Court denied certiorari.

White then filed a petition for writ of habeas corpus, pursuant to 28 U.S.C.A. § 2254, in the federal district court. The district court, adopting the recommendation of the magistrate judge, granted summary judgment to respondent and denied the petition. White filed a notice of appeal to this court, and the district court granted a certificate of appealability. *See* 28 U.S.C.A. § 2253(c)(2) (West Supp. 2000).

## II.

On appeal, White raises five claims for habeas relief, all of which have been adjudicated on the merits by the North Carolina state courts. Accordingly, we review White's claims under 28 U.S.C.A. § 2254(d), as interpreted by the Supreme Court in *Williams v. Taylor*, 120 S. Ct. 1495 (2000).

Under § 2254, we may not grant federal habeas relief unless we conclude that North Carolina's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); *see Williams*, 120 S. Ct. at 1518. A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts," *Williams*, 120 S. Ct. at 1523. A state court decision "in-

volve[s] an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), if the state court decision "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S. Ct. at 1523. An objectively "unreasonable application of federal law is different from an incorrect or erroneous application of federal law." *Id.* Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable" for habeas relief to be granted. *Id.* at 1522.

White asserts that we should remand this case to the district court for reconsideration of his petition in light of the Supreme Court's decision in *Williams*, which was issued after the district court's decision but before briefing in this appeal. In *Williams*, the Supreme Court affirmed this court's interpretation of § 2254(d)(1) in *Green v. French*, 143 F.3d 865 (4th Cir. 1998), with one exception. Although the Court affirmed our holding that the "reasonableness" inquiry under § 2254(d)(1) is an objective one, it did not adopt "our statement that state courts unreasonably apply clearly established federal law only when they 'interpret[ ] or apply[ ]' such law 'in a manner that reasonable jurists would all agree is unreasonable,' *Green*, 143 F.3d at 870, on the ground that this statement 'would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one, *Williams*, 120 S. Ct. at 1522." *Oken v. Corcoran*, 220 F.3d 259, 264 (4th Cir. 2000) (alterations in original). White contends that the district court improperly relied upon the "unreasonable jurist" standard in its denial of his § 2254 petition and, therefore, that we should remand this case to the district court for reconsideration. However, we review the district court's grant of summary judgment to the respondent de novo, applying the same standard of review applicable under 28 U.S.C.A. § 2254(d) to the state court's adjudication of petitioner's claims on the merits. Therefore, remand to the district court is unnecessary.

III.

A.

White's first contention is that his death sentence must be reversed because the trial court's instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance, *see* N.C. Gen. Stat. § 15A-2000(e)(9), was unconstitutionally vague in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Under North Carolina law, a person may be sentenced to death if the jury finds, as an aggravating circumstance, that "[t]he capital felony was especially heinous, atrocious, or cruel." N.C. Gen. Stat. § 15A-2000(e)(9). White's jury was presented with this statutory aggravating circumstance for consideration, along with the following limiting instruction taken from North Carolina's pattern jury instructions:

> Was this murder especially heinous, atrocious or cruel? In this context "heinous" means extremely wicked, shocking. "Atrocious" means outrageously wicked and vile. "Cruel" means designed to inflict a high degree of pain with utter[ ] indifference to, or even for the enjoyment of, the suffering of others. However, it is not enough that the murder was heinous, atrocious, and cruel, as those terms have been defined, but this murder must have been especially heinous, atrocious, and cruel, and not every murder is especially so. For this murder to have been especially heinous, atrocious, and cruel any brutality which was involved in it must have exceeded that which is normally present in any killing, or this killing must have been a consciousless or pitiless crime which was unnecessar[ily] torturous to the victim.

J.A. at 160-61. On direct appeal from White's conviction, the North Carolina Supreme Court summarily rejected White's vagueness challenge under existing precedent. *See White*, 471 S.E.2d at 603. Specifically, in *State v. Syriani*, 428 S.E.2d 118 (N.C. 1993), the court had rejected a vagueness challenge to the pattern jury instruction for the (e)(9) circumstance because the instruction "incorporate[d] narrowing definitions adopted by the [North Carolina Supreme] Court and

expressly approved by the United States Supreme Court, or are of the tenor of the definitions approved." *Syriani*, 428 S.E.2d at 141.

A state's capital sentencing scheme may not allow for the imposition of the death penalty in an arbitrary and capricious manner. *See Furman v. Georgia*, 408 U.S. 238 (1972); *Fisher v. Lee*, 215 F.3d 438, 457 (4th Cir. 2000). In the case of statutory aggravating circumstances, a circumstance may not be so vague as to provide no meaningful basis for distinguishing a death penalty case from other murders. *See Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980); *Fisher*, 215 F.3d at 457. Such "[c]laims of vagueness . . . characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman*." *Maynard*, 486 U.S. at 361-362.

North Carolina's "especially heinous, atrocious, or cruel" aggravating circumstance, standing alone, is unconstitutionally vague. *See id.* at 364; *Fisher*, 215 F.3d at 458-59; *Smith v. Dixon*, 14 F.3d 956, 974 (4th Cir. 1994) (en banc). However, this does not end the inquiry. A statutory circumstance that is alone too vague to provide meaningful guidance to the sentencer may be accompanied by a limiting instruction which does provide sufficient guidance. *See Shell v. Mississippi*, 498 U.S. 1, 3 (1990) (Marshall, J., concurring); *Fisher*, 215 F.3d at 457-58. The North Carolina court has found that the limiting construction placed upon its "heinous, atrocious, or cruel" aggravating circumstance provides sufficient guidance to the sentencer to ensure that the death sentence is not imposed in an arbitrary or capricious manner. Because we cannot say that the state court's rejection of White's vagueness challenge was contrary to or an unreasonable application of the relevant Supreme Court precedents, White is not entitled to habeas relief on this basis. *See Fisher*, 215 F.3d at 459.

B.

White next claims that his counsel was ineffective during the penalty phase of his trial, in violation of his Sixth Amendment right to effective assistance of counsel. White is also not entitled to habeas relief on this basis.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In order to satisfy the right, the assistance must also be effective. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish a claim that counsel was ineffective, the petitioner must demonstrate (1) that his "counsel's representation fell below an objective standard of reasonableness" in light of the prevailing professional norms, *id.* at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

White's specific claim of ineffective assistance of counsel centers on counsel's decision to call White's court-appointed psychiatrist, Dr. John Billinsky, to testify concerning White's diagnosed personality disorder as support for mitigating circumstances to be submitted to the jury. As a part of his testimony, Billinsky testified that White had a history of habitual lying, which was a manifestation of his mental illness. White contends that counsel's decision to call Dr. Billinsky to testify undermined White's testimony that he was remorseful for having committed the murder and, thereby, "effectively" deprived him of his constitutional right to testify at sentencing. The state court rejected this claim, finding that White's trial counsel balanced the evidence and reasonably concluded that, because Dr. Billinsky offered more positive than negative conclusions, he should testify in support of mitigating circumstances to be submitted to the jury.

We cannot say that North Carolina's rejection of White's ineffective assistance of counsel claim was contrary to or an unreasonable application of Supreme Court law governing such claims. Following an evidentiary hearing, the state MAR court made various findings and conclusions regarding White's trial counsel and the strategy he employed during the penalty phase of the trial. Trial counsel was experienced in murder trials, having served both as a prosecutor and defense counsel at various times in his career. Prior to White's first trial, counsel sought and obtained a court-appointment for a forensic psychiatrist to evaluate White and ultimately retained Dr. Billinsky, who was well-respected in his field. Dr Billinsky met with White and evaluated him, as requested, and had White evaluated by a psychologist. Prior to the second trial, counsel relocated and re-interviewed pertinent witnesses and Dr. Billinsky again met with White.

During the penalty phase of the retrial, counsel presented testimony of family, friends, mental health professionals, and prison guards at Central Prison where White was incarcerated. This evidence tended to show that White expressed remorse for the murder, that he had adapted well to prison life during the four years of confinement prior to his second trial, that he had been helpful to his cousin who had been abused, that he was kind and considerate to the children of family and friends, and that he came from an abusive family with substance addictions. After consultation with his counsel, White also testified on his own behalf, expressing remorse and accepting responsibility for killing Ewing.

Dr. Billinsky, who had testified as an expert witness during the guilt phase of the trial, was recalled to testify during the sentencing phase of White's trial. Dr. Billinsky testified that White had a mixed personality disorder, with antisocial and narcissistic tendencies. Dr. Billinsky's overall evaluation of White, including his diagnosis that White suffered from a personality disorder, was supported by his clinical evaluations and by tests performed by the psychologist. Dr. Billinsky also offered his opinion that White committed the murder of Ewing while under the influence of a mental or emotional disturbance and that White's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time.

At the MAR hearing, White's trial counsel testified that he recommended that White testify because he believed it important that the jury hear White express remorse and that they see him as an individual life worth saving. Counsel further testified that, although he knew that White's history of habitual lying was a part of his personality disorder, he balanced the evidence and concluded that the beneficial aspects of Dr. Billinsky's testimony outweighed this harmful fact. Counsel believed that this testimony was important to support the mitigating circumstances that White committed the capital felony while under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

We agree that counsel's representation of White in this regard did not fall "below an objective standard of reasonableness" in light of prevailing professional norms. *Strickland*, 466 U.S. at 688. Counsel's recommendation that White testify in person was supported by sound trial strategy, as was his decision to call Dr. Billinsky in support of the other mitigating circumstances, and counsel's approach to the sentencing phase was one which we should not second guess. Indeed, counsel's strategy succeeded in persuading at least one member of White's first jury that both mitigating circumstances existed, and succeeded in persuading at least one member of White's second jury that White's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Finally, even were we to conclude that White's counsel should not have called Dr. Billinsky to testify, we are satisfied that "there is [no] reasonable probability that, absent the [alleged] error[ ], the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. White's jury was already aware that White had given different versions of Ewing's murder, which allowed for an argument that White had lied, and at least one member of the jury found as a mitigating circumstance that White had indeed expressed remorse for the murder. Accordingly, we conclude that the state court's decision rejecting White's claim that he received ineffective assistance of counsel was neither contrary to nor an unreasonable applicable of the principles set forth by the Supreme Court in *Strickland* and White is not entitled to habeas relief on this claim.

C.

White next contends that the trial court improperly instructed the jury on the defense of voluntary intoxication. In order to obtain a voluntary intoxication charge in North Carolina, a "defendant must produce substantial evidence which would support a conclusion by the trial court that at the time of the crime for which he is being tried" his "'mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill.'" *See State v. Cheek*, 520 S.E.2d 545, 560-61 (N.C. 1999) (quoting *State v. Strickland*, 361 S.E.2d 882, 888 (N.C. 1987)), *cert. denied*, 120 S. Ct. 2694 (2000). The trial court instructed the jury that:

> Generally, voluntary intoxication or voluntary drug inducement is not a legal excuse for any crime. However, if you find that the Defendant was intoxicated or drugged, you should consider whether this condition affected his ability to formulate a specific intent which is required for the conviction of first degree murder.
>
> In order for you to find the Defendant guilty of first degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual specific intent to kill, formed after premeditation and deliberation. If, as a result of intoxication or a drugged condition, the Defendant *could not have* the specific intent to kill the deceased formed after premeditation and deliberation, he is not guilty of first degree murder as to that theory.

J.A. 120 (emphasis added). In doing so, the trial court deviated from the North Carolina pattern instruction, which states that the defendant is not guilty of first degree murder if he "*did not have* the specific intent to kill" the deceased formed after premeditation and deliberation. *White*, 471 S.E.2d at 601 (emphasis added). White asserts that this mistake improperly shifted the burden of proof from the state to White in violation of his due process rights under the Fourteenth Amendment.

Applying the "plain error" standard of review because White did not object to the instruction during trial, the North Carolina Supreme

Court rejected White's due process claim on direct appeal. Immediately after this "slip of the tongue," *id.* at 601, the trial court had instructed the jury as follows:

> Therefore, I charge you that upon considering the evidence with respect to the Defendant's intoxication or drugged condition, if you have a reasonable doubt as to whether the Defendant formulated a specific intent required for a conviction of first degree murder, you would not return a verdict of guilty as to that charge as it relates to premeditation and deliberation.

J.A. 120-121. Thus, the state appellate court held that "[a] review of the entire instruction reveal[ed] that the court did not shift the burden of proof" and that even "assuming *arguendo* that the instruction contained error, the error did not have a probable impact on the jury's finding of guilt and did not constitute plain error." *White*, 471 S.E.2d at 601.

White asserts that the court's misstatement of the pattern jury instruction improperly shifted the burden of proving intent in violation of *In re Winship*, 397 U.S. 358 (1970), and *Mullaney v. Wilbur*, 421 U.S. 684 (1975), and ran afoul of our holding in *Guthrie v. Warden*, 683 F.2d 820 (4th Cir. 1982). Although White is correct that a state must prove each element of an offense of conviction beyond a reasonable doubt, *see In Re Winship*, 397 U.S. at 364; *Mullaney*, 421 U.S. at 703-04, this case is not like our decision in *Guthrie*. In *Guthrie*, the jury was specifically "instructed that the accused must persuade . . . the jury, that . . . he was so intoxicated as to be incapable of entertaining the specific intent or of possessing the mental state which is an essential element of the crime for which he is being prosecuted." *Guthrie*, 683 F.2d at 822 (internal quotation marks omitted and alterations in original). Because the instruction in *Guthrie* "imposed on the defendant the burden of negating criminal intent by proving that he acted . . . in a state of extreme intoxication," it ran afoul of the principles of *Mullaney*. *Id.* at 823. White's jury, in contrast, was not instructed that White had the burden of proving the absence of criminal intent. "Instead, the court correctly focused the jury's attention in considering the evidence of intoxication on the State's burden of proof by instructing that if the jury had a reasonable

doubt as to whether defendant formulated a specific intent required for a first-degree murder conviction, the jury would not find defendant guilty of first degree murder based on premeditation and deliberation." *White*, 471 S.E.2d at 601.

We cannot say that North Carolina's decision in this regard was contrary to or an unreasonable application of the Supreme Court precedents. However, even were we to assume that the instruction was constitutional error and that the North Carolina Supreme Court's rejection of the constitutional claim was "contrary to" or "an unreasonable application of" federal law, White is still not entitled to habeas relief. For purposes of federal habeas review, a constitutional error is considered harmless unless "the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). "[M]ere speculation that the defendant was prejudiced by [the] trial error" is insufficient. *Calderon*, 525 U.S. at 146. Rather, "the court must find that the defendant was actually prejudiced by the error." *Id.* Similarly, in the context of erroneous jury instructions, the Supreme Court has recognized that "[t]he burden of demonstrating that an erroneous [jury] instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Id.* (internal quotation marks and citations omitted).

Here, the jury instruction given contained a single misstatement from the North Carolina pattern jury instruction: the trial court instructed the jury that the defendant is not guilty of first degree murder if, by reason of intoxication or a drugged condition, he "could not have" rather than "did not have" the intent to kill his victim. Immediately after the misstatement, the jury was instructed that it must not return a verdict of guilty if it had "a reasonable doubt as to whether [White] formulated a specific intent" due to his intoxication. Accordingly, we cannot say that the instructions given to the jury on the

intoxication defense "had [a] substantial and injurious effect or influence in determining the jury's verdict," thereby causing him "actual prejudice." *Brecht*, 507 U.S. at 637 (internal quotation marks omitted). Nor was it an error that so infected the trial that the imposition of the death sentence violated White's due process rights. *See Kibbe*, 431 U.S. at 156-57. We are satisfied that the jury would have reached the same verdict had the single misstatement not occurred and, at a minimum, view the possibility that the jury might have reached a different verdict had the misstatement not occurred as too speculative to justify habeas relief. *See id.*

### D.

White's next claim is that the trial court erred in submitting as a mitigating circumstance that White had "no significant history of prior criminal activity," *see* N.C. Gen. Stat. § 15A-2000(f)(1), because the circumstance was unsubstantiated in view of the large amount of evidence already presented about White's criminal history. On direct appeal, the North Carolina court held that the trial court erred in submitting the "no significant history of prior criminal activity" mitigating circumstance, but concluded that the error was not prejudicial to White. *See White*, 471 S.E.2d at 602-03. The jury was not told that White requested this mitigating circumstance, or that he believed it to be warranted, and there is no indication that White was prejudiced by the mere submission and rejection of the mitigating circumstance. *Id.* at 603.

The crux of White's complaint, however, is that the erroneous submission of the mitigating circumstance rendered his trial fundamentally unfair because the State was allowed, as a result of the submission, to present testimony regarding another alleged sexual assault committed by White. However, we cannot conclude that White was actually prejudiced by the admission of the third sexual assault. The evidence already presented concerning Ewing's murder revealed that Ewing was found naked and murdered in her bedroom. Her hands had been tied behind her back with an electrical cord, she had been stabbed, and her throat had been slashed. The evidence of White's criminal history already presented included evidence of two sexual assaults committed against other women by placing a sharp blade to their throats and making them remove clothing. The evidence

presented regarding the third sexual assault was somewhat similar in nature to the testimony regarding the two sexual assaults already presented, although it involved the alleged sexual assault of a seventeen-year-old, but without the use of a weapon. Given the totality of the evidence already presented, we cannot say that the state court's determination that the error was harmless was an unreasonable one. Moreover, we conclude that the submission of the mitigating circumstance and admission of the single additional criminal incident did not have the requisite "substantial and injurious effect or influence" in determining the jury's verdict to warrant federal habeas relief. *Calderon*, 525 U.S. at 147; *Brecht*, 507 U.S. at 637.

E.

White's final claim is that he should have been allowed to question prospective jurors during voir dire concerning their beliefs about parole eligibility and that the jury should have been instructed concerning White's parole eligibility if they gave him a life sentence. During the juror deliberations, the jury sent a note to the judge requesting: "A legal definition of 'life imprisonment.' In particular does the sentence allow for the possibility of appeal and/or parole." J.A. 165. The trial court instructed the jury as follows:

> The question of eligibility of parole is not a proper matter for you to consider in recommending punishment and it should be eliminated entirely from your considerations and dismissed from your minds.

> In considering whether to recommend death or life imprisonment, you should determine the question as though life imprisonment means exactly what the statute says, imprisonment for life in the State's prison.

J.A. 162.

White acknowledges that, under North Carolina law, he would have been eligible for parole if sentenced to life imprisonment on the capital murder charge. *See* N.C. Gen. Stat. § 15A-1371(a)(1) (repealed 1994). However, White asserts that he was entitled to have

the jury told that a life sentence for the capital murder charge, coupled with the time he would receive if convicted of the other offense and his age of thirty-five years, would result in no "practical way" or "realistic chance" that he would actually be paroled during his lifetime. Concluding that the instruction given by the judge was a correct statement of the law, the North Carolina state court found no error and denied White's claim on direct appeal.

In *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994), the Supreme Court held that a capital defendant who is ineligible for parole is entitled to apprise the jury of that fact if the state argues future dangerousness as a basis for imposing the death penalty. Recently, the Court declined to adopt "a functional approach" to parole eligibility questions, "under which . . . [the] court evaluates whether it looks like the defendant will turn out to be parole ineligible," and held that "*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone*, 120 S. Ct. 2113, 2121 (2000); *see also id.* at 2127-28 (O'Connor, J., concurring). We, too, have held that the decision in *Simmons* applies only to defendants who are parole ineligible, consistently rejecting attempts to expand *Simmons* to capital defendants who would be eligible for parole. *See Roach v. Angelone*, 176 F.3d 210, 220 (4th Cir.), *cert. denied*, 120 S. Ct. 401 (1999); *Keel v. French*, 162 F.3d 263, 270 (4th Cir. 1998), *cert. denied*, 527 U.S. 1011 (1999); *Fitzgerald v. Greene*, 150 F.3d 357, 367 (4th Cir. 1998). Because North Carolina's disposition of White's parole eligibility claims was neither contrary to nor an unreasonable application of the Supreme Court's decision in *Simmons*, White is not entitled to habeas relief on this basis.

IV.

For the foregoing reasons, the judgment of the district court denying White's petition for writ of habeas corpus pursuant to 28 U.S.C.A. § 2254 is affirmed.

*AFFIRMED*